UNITED STATES of America, Plaintiff–Appellee,

v.

Benny Ray QUERTERMOUS, Defendant–Appellant.

No. 91–1263 Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Oct. 22, 1991.

Paul D. Stickney, Asst. Federal Public Defender, AFPD, Dallas, Tex., for defendant-appellant.

Robert Webster, Delonia A. Watson, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before POLITZ, KING and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

In this case, we interpret the applicability of the criminal livelihood provision of the U.S. Sentencing Guidelines. The defendant, Benny Ray Quertermous, pleaded guilty to one count of knowing possession of stolen mail, a violation of 18 U.S.C. § 1708. He was sentenced to thirty months imprisonment, followed by a three-year term of supervised release, and required to pay restitution in the amount of $1594. Quertermous timely noticed his appeal of the sentence imposed by the district court.

## I. BACKGROUND

Quertermous raises a single argument on appeal. He contends that the district court erred in applying the criminal livelihood adjustment of U.S.S.G. § 4B1.3 to his sentence. Section 4B1.3 provides:

> If the defendant committed an offense as part of a pattern of criminal conduct engaged in as a livelihood, his offense level shall be not less than 13, unless § 3E1.1 (Acceptance of Responsibility) applies, in which event his offense level shall be not less than 11.

The application notes accompanying this provision establish two criteria that define whether a defendant engaged in a pattern of criminal conduct as a livelihood: (1) the defendant must have derived income from his pattern of criminal conduct that in any twelve-month period exceeded 2000 times the then-existing hourly minimum wage, and (2) the totality of circumstances must demonstrate that the criminal conduct was the defendant's primary occupation in that

twelve-month period. U.S.S.G. § 4B1.3, comment. (n. 2).

Quertermous contends that the total amount of income he derived from his criminal conduct was $2394 (less than $6700, 2000 times the then-existing hourly wage of $3.35).[1] Quertermous further contends that he offered evidence of legitimate employment and that he was engaged in stealing mail for only two three-month periods, one each in 1989 and 1990. Quertermous asserts that the sentencing court failed to establish that he received the threshold amount of $6700 and that stealing mail was his primary occupation.

The presentence report (PSR) states that Quertermous was arrested on March 7, 1990, at which time 189 pieces of stolen mail were found in the vehicle in which he was a passenger. Quertermous admitted that he had been paid $400 on two occasions for stealing this mail. On August 14, 1990, Quertermous fled on foot while he was being questioned for parking in a handicapped parking space. From a briefcase in the vehicle, authorities recovered stolen mail and a fraudulent identification card. Included in the stolen mail was $6587.81 worth of stolen checks. Quertermous's girlfriend and co-defendant admitted that she had forged $1594 worth of checks that had been obtained in connection with this theft. Using these figures and adding an earlier amount from another incident, the probation officer calculated a value loss figure, for the purposes of § 2B1.1, of $9541.81.

Quertermous argues that he only received $2394 from his theft activities and that he therefore did not meet the $6700 threshold for application of § 4B1.3. He apparently arrives at this figure by adding the two $400 payments ($800) plus the $1594 worth of checks that his girlfriend cashed. He implicitly contends that only these amounts can be counted as the proceeds of his criminal activity because these

---

[1] Although the sentencing transcript refers to an approximate figure of $6000, published cases from the relevant time period indicate that the hourly minimum wage was $3.35, making the correct figure $6700. *See United States v. Cryer,* 925 F.2d 828, 830 (5th Cir.1991); *see also* U.S.S.G. App. C, amendment 354 (specific reference to $6700 deleted as of November 1, 1990).

were the only actual cash amounts received by him.

## II. DISCUSSION

We recently interpreted the amended[2] § 4B1.3 in *United States v. Cryer*, 925 F.2d 828, 830 (5th Cir.1991), the facts of which are instructive here. In *Cryer*, we applied § 4B1.3 to a defendant who had pled guilty to unlawfully possessing a credit card stolen from the mail. Cryer used the credit card to purchase $2071.91 in goods and services.[3] In computing the loss amount, pursuant to § 2B1.1, the sentencing court also included the value of a car the defendant had stolen.[4] In this way, the district court found that the total amount of income imputable to Cryer as a result of his pattern of criminal behavior exceeded $6700, and therefore § 4B1.3 applied.

■ On appeal and in the district court, Quertermous's objection to the $9541.81 figure implicitly derives from an assumption that the value of the uncashed stolen checks cannot be attributed to him as income derived from his crime. Quertermous did not dispute the amounts or dates in the offense-conduct description paragraphs of the PSR, but only whether certain amounts should be counted in the calculation of the proceeds of his activity.

Quertermous's argument against including the value of uncashed stolen checks as income from his crime must fail. Although we have not previously addressed this issue directly, we have stated, in addressing a district court's determination under § 4B1.3 of income derived from criminal activity, that district courts enjoy wide latitude in implementing the Sentencing Guidelines, particularly regarding findings of fact. *Cryer*, 925 F.2d at 829.

■ In determining that § 4B1.3 applied to Quertermous, the district court stated:

I find from a preponderance of the evidence of sufficient reliability to support its probable accuracy that the defendant committed the offense in question as part of a pattern of criminal conduct from which he derived a substantial portion of his income.[5]

Given the facts set forth in the PSR, we cannot find that the district court erred in applying the § 4B1.3 adjustment to Quertermous. Although the district court did not make specific findings regarding the threshold minimum wage-based figure during a twelve-month period, we nonetheless uphold the implicit findings as supported by the evidence. This comports with the reasoning in *Cryer*, 925 F.2d at 830, as well as the explicit holdings of other cases. *See, e.g., United States v. Rodriguez*, 897 F.2d 1324, 1327–28 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 158, 112 L.Ed.2d 124 (1990). An implied finding and

---

2. Effective November 1, 1989, § 4B1.3 was amended to its present state from previous language which required that the pattern of criminal conduct be one "from which he derived a substantial portion of his income," instead of which he "engaged in as a livelihood." *See, e.g., United States v. Irvin*, 906 F.2d 1424, 1427 (10th Cir.1990).

3. Cryer had been arrested when trying to cash a stolen payroll check, and at the time of his arrest the car he was driving had a number of checks and credit cards stolen from the mail. The value of these additional items were not included in the *Cryer* sentencing court's computation of income or loss under the Guidelines. Although *Cryer* does not explain this omission, a postal inspector assigned to the present case testified at sentencing that it is the practice of the Postal Service to retain as evidence only enough stolen mail to secure a conviction; the remainder is forwarded to the addressees as soon as possible. Presumably, this explains

why the value of some other stolen instruments was omitted from the calculation in *Cryer*, but was included in this case.

4. The stolen car was not part of the charge to which Cryer had pled guilty.

5. The "substantial portion of his income" language came from the pre–1989 § 4B1.3. *See* note 2, *supra*. Although the court invoked the earlier language, it was aware of the amended commentary, as the judge asked defense counsel whether it was his position that the court had to find at least a one-year time frame and at least the multiple of the minimum wage. Defense counsel responded, "No, I don't think that is correct.... I think that is just a guideline set out by the commentary, at least in my opinion, to give the court an idea of which way to go." Nevertheless, testimony before the court stated an approximation of the relevant minimum wage figure and the amount of income Quertermous derived from his crime.

a specific finding under the Guidelines are equally entitled to the clearly erroneous standard of review. *See, e.g., United States v. Matovsky*, 935 F.2d 719, 722 (5th Cir.1991) (reviewing an implicit finding of ability to pay a fine); *United States v. Reyes–Ruiz*, 868 F.2d 698, 701 (5th Cir. 1989) (reviewing implied finding that a defendant had a prior conviction for a particular offense), *overruled on other grounds*, *United States v. Bachynsky*, 934 F.2d 1349 (5th Cir.1991) (en banc).

Quertermous received $800 in payment for his theft of checks in connection with the March 7, 1990, recovery of stolen mail and checks. In August 1990, stolen checks amounting to $6587.81 were recovered, and Quertermous's girlfriend admitted she had successfully forged another $1594 worth of unrecovered checks from that incident. These figures yield a total of $8981.81 [6] during a period of several months during 1990. This evidence supports the district court's implied finding that Quertermous derived from his criminal activity at least the threshold amount of income to warrant application of § 4B1.3.[7]

In addition to the threshold minimum wage finding, application of § 4B1.3 requires a finding that the totality of circumstances shows that the defendant's criminal livelihood was his primary occupation, rather than any regular, legitimate employment. *See* U.S.S.G. § 4B1.3, comment. (n. 2). The district court's findings, based on the PSR, are supported by the evidence and do not evince clear error. The probation officer testified at the sentencing hearing that she had been unable to verify the previous employment that Quertermous had claimed. Letters she had sent to prior employers named by Quertermous had been returned as undeliverable. Quertermous claimed to have been self-employed as a roofer intermittently from 1987 to 1990, but he had been unable to

provide any records of employment because he was always paid in cash. When offered an opportunity at the sentencing hearing to present evidence of legitimate employment, Quertermous's counsel could offer only his own assertions that he had confirmed previous employment. *See United States v. Luster*, 889 F.2d 1523, 1531 (6th Cir.1989) (although defendant alleged various legitimate employment, he failed to provide documentation of legitimate income or taxes paid thereon). As in *Rodriguez*, Quertermous did not offer any evidence in rebuttal to the PSR's findings, nor did he testify at the sentencing hearing. *See Rodriguez*, 897 F.2d at 1327–28.

The postal inspector who investigated the case testified that Quertermous admitted he could not get employment and had resorted to stealing checks in order to provide food and shelter. The probation officer testified at the sentencing hearing that Quertermous told her during two different interviews that he lived off the proceeds of the stolen mail. She further testified that, when she interviewed a co-defendant, who had paid Quertermous the $800 for stealing mail, he indicated that Quertermous was not employed and was making his living from stolen mail. The totality of these circumstances clearly supports the district court's implied finding that Quertermous's primary source of income and livelihood during the relevant time period was derived from stealing mail. As such, the court properly applied the adjustment under § 4B1.3.

## III. CONCLUSION

Finding no clear error in the district court's application of § 4B1.3, we AFFIRM the sentence imposed by the district court.

---

6. This figure is different from the $9541.81 loss figure in the PSR because that amount included an additional $560 worth of checks recovered from an offense occurring in February 1989, outside a period of twelve months relative to the other offense dates.

7. We note that other Guidelines provisions support the inclusion of uncashed checks in a com-

putation such as this. For example, the application note to § 2B1.1 states that "in the case of the theft of a government check or money order, loss refers to the loss that would have occurred if the check or money order had been cashed." U.S.S.G. § 2B1.1, comment. (n. 2); *see also* U.S.S.G. § 2X1.1.