# United States Court of Appeals
## For the First Circuit

No. 15-2395

UNITED STATES OF AMERICA,

Appellee,

v.

MARCO GORDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Jonathan Shapiro, with whom Molly Campbell and Shapiro, Weissberg & Garin, LLP were on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

March 29, 2017

**LYNCH**, **Circuit Judge**.  This case, of first impression for this circuit, involves the interpretation of a sentencing guideline that is frequently used to enhance sentences for those convicted of drug-related crimes, see U.S.S.G. § 2D1.1(b)(15)(E), and is potentially applicable to a wide range of other offenses, see id. § 4B1.3.

On July 7, 2015, Marco Gordon pled guilty to conspiracy to possess with intent to distribute, and possession with intent to distribute, more than 28 grams of cocaine base, see 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), for his role in a drug-trafficking organization that operated primarily in Portland, Maine from October 2013 to January 2015.  He does not dispute that he held a leadership role in the illicit organization, which was responsible for trafficking approximately 839 grams of cocaine base during a fifteen-month period.

Gordon appeals only his sentence of 132 months of imprisonment, arguing that the district court improperly applied a two-level enhancement -- for offenses committed "as part of a pattern of criminal conduct engaged in as a livelihood," U.S.S.G. §§ 2D1.1(b)(15)(E), 4B1.3 -- both by misinterpreting the guideline and by making erroneous predicate findings of fact.

In order to apply that criminal livelihood enhancement, the court needed to find that over a twelve-month period, Gordon

"derived income" in excess of $14,500[1] from drug trafficking and engaged in drug-trafficking as his "primary occupation."  Id. § 4B1.3 app. n.2.  We affirm Gordon's sentence because the district court did not commit legal error when it used Gordon's gross, rather than net, income derived from drug trafficking to determine that his income surpassed the $14,500 threshold, nor did the court commit factual error when it concluded that drug trafficking was Gordon's primary occupation.

## I.

On January 9, 2015, Gordon was arrested in an apartment in Portland, Maine in connection with a fifteen-month federal investigation into a drug-trafficking organization that had operated in "Michigan, Connecticut, and Portland, Maine, though the primary location was in Portland."  During a search incident to Gordon's arrest, officers found $990 and 0.31 grams of cocaine base in his pockets, and they found an additional $3,425.46 and 183.6 grams of cocaine base in the apartment.  Gordon was indicted on January 29, 2015, along with four co-defendants, for his role in an interstate drug conspiracy.

Gordon pled guilty on July 7, 2015 to possessing with the intent to distribute in excess of 28 grams of cocaine base, 21

---

[1]    This figure is equal to 2,000 times the hourly federal minimum wage in effect during the time period relevant to this case, per 29 U.S.C. § 206 -- the total called for in the guideline. See U.S.S.G. § 4B1.3 app. n.2.

U.S.C. § 841(a)(1), (b)(1)(B), and conspiring to do the same, id. § 846. Gordon does not dispute that the money and drugs seized during his arrest (with a street value of roughly $28,935) belonged to him and that the conspiracy to which he belonged trafficked at least 671 grams of cocaine base (with a street value of roughly $89,480) during the twelve months preceding his arrest.

At a November 6, 2015 sentencing hearing, the district court calculated Gordon's Guidelines Sentencing Range ("GSR") to be 188 to 235 months. That GSR included a two-level enhancement, sought by the government, which applies when "[t]he defendant committed [the relevant] offense as part of a pattern of criminal conduct engaged in as a livelihood." U.S.S.G. §§ 2D1.1(b)(15)(E), 4B1.3. The court applied that enhancement over Gordon's objection but ultimately sentenced him to 132 months of imprisonment, which represented a 56-month downward variance from the low end of the resulting GSR. On November 18, 2015, Gordon appealed his sentence to this court, limiting his challenge to whether the district court erred in applying the criminal livelihood enhancement.

The criminal livelihood enhancement applies where the government proves, by a preponderance of the evidence, that two conditions have been met: (1) the defendant committed the relevant offense as "part of a pattern of criminal conduct" and (2) the defendant was engaged in that conduct "as a livelihood." Id. §§ 2D1.1(b)(15)(E), 4B1.3. On appeal, Gordon argued only that the

government had failed to meet its burden as to the second condition.

The Guidelines further divide that second condition into two prongs. A defendant was engaged in a pattern of criminal conduct "as a livelihood" only if:

> (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law[,] [meaning $14,500 in the instant case]; and
>
> (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

Id. § 4B1.3 app. n.2. Gordon argued on appeal, as he had before the district court, that the government had failed to meet its burden as to both prongs.

As to the first prong, Gordon argued that the court had erred in finding that he had derived "income" in excess of $14,500 from drug trafficking during the relevant time period because the court had considered his gross, rather than net, income, and that if the court had properly deducted the expenses related to his drug trafficking, it would have found that his earnings fell short of the threshold. Gordon also argued that the court had overestimated his income by twenty percent because it had not

identified a twelve-month period to consider and had thus implicitly treated all of the income he had earned over the fifteen-month life of the conspiracy as if he had earned it in a year. As to the second prong, Gordon argued that the court had erred in finding that drug trafficking had been his primary occupation because his primary occupation had actually been his legitimate self-employment as a barber.

The premise of Gordon's first argument -- that in order to apply the criminal livelihood enhancement, a district court must, as a matter of law, find that a defendant's net, rather than gross, income from criminal activity exceeded $14,500 -- raised an issue of first impression in this circuit. Gordon made that argument, albeit for the first time, during the sentencing hearing. But the prosecution did not take a position on that argument. And the district court determined that Gordon's income met the $14,500 threshold without explicitly stating "whether its finding was based on the net [or] gross[] approach." As a result, "we [were] unable to address [a] key issue[] on appeal," and so we sought clarification from the district court as to what exactly it had decided. On December 12, 2016, this court issued an order remanding the case, requesting that the district court clarify its findings relevant to Gordon's first argument on appeal. We invited the district court to "take further evidence and make further findings" if necessary.

On January 27, 2017, the district court issued an order in response to the remand clarifying that it had utilized the gross-income approach and reiterating its conclusion that, under that approach, the criminal livelihood enhancement applied.[2] See United States v. Gordon, No. 2:15-cr-27-GZS, 2017 WL 383349, at *2 (D. Me. Jan. 27, 2017). The court explained that the "derived income" language in § 4B1.3 app. n.2(A) allows a district court to use a defendant's gross income. It reasoned that if the Guidelines had meant to require a court to consider a defendant's net income, then they would have provided "specific guidance . . . regarding how to calculate net income for the many offenses covered by [the enhancement]." Id.

The court also noted that the parties disagreed as to what constituted a "deductible expense" and as to what should be viewed more properly as a distribution of profits. Id. For example, the government argued that gross income should be used, but that if net income were used, only the amount Gordon had paid to acquire the cocaine base he sold could be netted out against

---

[2] The court concluded, and Gordon does not contest, that "during the twelve-month period measured from January 9, 2014 to [the date of Gordon's arrest on] January 9, 2015, . . . Gordon personally derived gross income in excess of $14,500" from drug trafficking. United States v. Gordon, No. 2:15-cr-27-GZS, 2017 WL 383349, at *1 (D. Me. Jan. 27, 2017). As to Gordon's net income, the court concluded that, on the limited evidence before it, given the amount of money Gordon had paid to procure the cocaine base, his net income from drug trafficking during that period was "less than $14,500." Id. at *2.

his gross earnings.  Id.  Gordon, in contrast, argued that the court should also deduct compensation he had purportedly paid subordinate dealers to move product on his behalf, as well as the cost of two televisions and a futon that he had purportedly purchased for an associate in exchange for allowing Gordon to store cocaine base at the associate's apartment.  Id. at *2-3.

The court also pointed out that it is the government's burden to prove the application of a sentencing enhancement, United States v. Alphas, 785 F.3d 775, 784 (1st Cir. 2015), but that the government will "frequently have little evidence to offer" regarding the precise, idiosyncratic and potentially numerous expenses attendant to a criminal enterprise, "especially when those expenses are cash payments or cash purchases made with drug proceeds," Gordon, 2017 WL 383349, at *3.  "Thus," the court concluded, "assuming [a district court] were required to make a net income finding . . . , it is not clear who [would] bear the burden of production for any deductible amounts."  Id.

Finally, the court held that even if it had not applied the criminal livelihood enhancement, and Gordon's GSR had been 151 to 188 months as a result, the court still would have varied downward and imposed the same 132-month sentence on Gordon.  Id.

On January 30, 2017, Gordon filed a notice of his intent to continue his appeal with this court in light of the district court's January 27 order.  In his supplemental appellate brief,

filed on February 17, 2017, Gordon renewed his claim that the district court had erred, as a matter of law, in calculating his derived income on a gross, rather than net, basis for purposes of the criminal livelihood enhancement. Of the other claims raised in Gordon's original appellate brief, which all pertained to purported factual errors underlying the court's application of the same enhancement, only Gordon's claim that the court had erred by finding that drug trafficking, rather than barbering, was his primary occupation during the relevant time period remains a live issue in this appeal.[3]

II.

A.  <u>Appeal from the District Court's Use of the Gross-Income Approach Under U.S.S.G. § 4B1.3 app. n.2(A)</u>

Gordon appeals from the district court's thoughtful holding that it was proper to apply § 4B1.3 app. n.2(A) of the Guidelines based on evidence of Gordon's gross income alone. Gordon argues that this was error, alleging that § 4B1.3 app. n.2(A) required the court to consider his net income.[4]  The

---

[3]  Gordon's challenges to the district court's factfinding regarding his income have been mooted. In its January 27, 2017 order, the district court clarified that its application of the criminal livelihood enhancement was based on its finding that Gordon derived gross income in excess of $14,500 from drug trafficking between January 9, 2014 and January 9, 2015, <u>see</u> <u>Gordon</u>, 2017 WL 383349, at *1 -- a finding that Gordon does not contest.

[4]  At no time, here or in the district court, has Gordon's able counsel argued that the rule of lenity should be applied to this Guidelines interpretation question. As such, the government

- 9 -

government denies that this was error but says that, if any error occurred, it was harmless in light of the district court's statement that it would have imposed the same 132-month sentence regardless of whether the criminal livelihood enhancement applied. See Gordon, 2017 WL 383349, at *3.

We address first the question of whether there was any error at all in the district court's use of the gross-income approach, a recurring and logically antecedent question. Then we turn to the government's argument that, if there was any error, that error was harmless. For the reasons that follow, we hold that there was no error.

The proper interpretation of a sentencing guideline is a question of law that we review de novo. United States v. Damon, 595 F.3d 395, 399 (1st Cir. 2010). We interpret a guideline "by applying familiar principles of statutory construction," id. at 400, meaning we look to "its text, structure, context, and purpose[]," id. at 401.

---

has not had the occasion to respond to any such argument, and it has been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). That alone distinguishes this case from United States v. Santos, 553 U.S. 507 (2008), where the parties explicitly addressed the applicability vel non of the rule of lenity in the distinct context of statutory interpretation. Further, as is now clear from Beckles v. United States, No. 15-8544, 2017 WL 855781 (U.S. Mar. 6, 2017), concerns about statutory vagueness, which underlie the rule of lenity, do not give rise to similar concerns regarding the Guidelines. Id. at *8.

The guideline at issue provides that a court applying the criminal livelihood enhancement must find that, in any twelve-month period, the defendant "derived income" from his criminal acts in excess of 2,000 times the then existing hourly minimum wage under federal law. U.S.S.G. § 4B1.3 app. n.2(A). The plain meaning of "income" does not resolve the question of whether a defendant's earnings should be measured on a gross or net basis, as the term is susceptible to both readings. Compare Income, Black's Law Dictionary (10th ed. 2014) (defining "income" as "[t]he money . . . that one receives"), with Income, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) (defining "income" as the money that one "gain[s]").

However, looking at the text of the guideline as a whole, we find a sufficient basis for the district court's decision to rely exclusively on evidence of Gordon's gross income in applying § 4B1.3 app. n.2(A). By its terms, the guideline's income threshold is designed to approximate the annual income of an employee earning the federal minimum wage, which is a gross figure.[5] See id. It is reasonable to infer from this deliberate linking of the income threshold to a specific level of gross income

---

[5] Indeed, the threshold is not designed to approximate the annual profits of a minimum wage worker after deducting the potentially numerous expenses associated with his employment, such as the taxes withheld from his paycheck, the gasoline or fare expended on his commute, the clothing required by his workplace dress code, and the child care he might need during working hours.

- 11 -

that the guideline intends for a defendant's income to be measured on a gross basis.

That interpretation is reinforced by the lack of discussion in the guideline of issues that would be key if courts were required to use a net-income approach.

First, the guideline does not discuss how net income should be measured. As the district court observed, § 4B1.3 app. n.2(A) can be applied to a wide range of offenses, and the types of "expenses" potentially associated with committing those offenses can vary greatly based on the particular circumstances of a given case and the level of generality at which expenses are viewed. See Gordon, 2017 WL 383349, at *2. Yet the guideline provides no information to guide a court in determining, with any degree of consistency and precision, "what qualifies as a deductible expense" for purposes of calculating a defendant's net income from criminal activity.[6] Id. Likewise, it provides no guidance as to how a court should treat taxes paid on illegal

---

[6] For example, in United States v. Kellams, the criminal livelihood enhancement was applied to a defendant who had committed mail fraud by sending invoices to local governments "demanding payment for products that he [had] never provided." 26 F.3d 646, 647 (6th Cir. 1994). If the court had been required to calculate the defendant's net income from the $15,917.41 he obtained, it is not clear whether it would have needed to treat as deductible expenses the postage he purchased, the paper and ink he used to print the fraudulent invoices, the post office box he rented to receive payments, and the gasoline he expended driving to and from that post office box. See id.

income or how it should distinguish between a defendant's expenses and the manner in which he chooses to distribute, spend, or reinvest his profits.  See id.

The guideline also makes no mention of how to allocate the burden of proving a defendant's net income.  The burden of establishing the applicability of an enhancement is generally on the government.  See Alphas, 785 F.3d at 784.  But, like the district court, we doubt that the Sentencing Commission intended to put on the government the burden of providing evidence of a defendant's expenses, which the government would often be unable to access.  See Gordon, 2017 WL 383349, at *3.

Given that the purpose of "the Sentencing Guidelines [is] to provide 'a framework . . . to guide the exercise of the court's discretion,' which 'promotes uniformity and fairness in sentencing,'" United States v. Hurley, 842 F.3d 170, 174 (1st Cir. 2016) (quoting United States v. Marchena-Silvestre, 802 F.3d 196, 200 (1st Cir. 2015)), this lack of guidance indicates that the Commission did not intend for § 4B1.3 app. n.2(A) to mandate the type of net-income accounting that Gordon envisions.

We hold that absent greater clarity in the Guidelines -- which we urge the Commission to provide -- the district court permissibly considered only Gordon's gross income from drug trafficking in applying § 4B1.3 app. n.2(A).  This holding is consistent with opinions from several other circuits.  See, e.g.,

- 13 -

United States v. <u>Cryer</u>, 925 F.2d 828, 830 (5th Cir. 1991); <u>United States</u> v. <u>Quertermous</u>, 946 F.2d 375, 378 (5th Cir. 1991); <u>United States</u> v. <u>Reed</u>, 951 F.2d 97, 101-02 (6th Cir. 1991); United States v. <u>Morse</u>, 983 F.2d 851, 853 (8th Cir. 1993); <u>United States</u> v. <u>Kellams</u>, 26 F.3d 646, 647, 649 (6th Cir. 1994); <u>United States</u> v. <u>Nastri</u>, 647 F. App'x 51, 54 (2d Cir.) (unpublished opinion), <u>cert. denied</u>, 137 S. Ct. 232 (2016).  While none of those courts were presented with the precise argument that the term "income" in § 4B1.3 app. n.2(A) requires a finding as to net income, they each affirmed the application of that guideline based on evidence of gross income alone.  And against the backdrop of this apparent majority approach, the Commission amended § 4B1.3 in 2010 without modifying the term "income" or altering the operative language of the provision in any way, <u>see</u> U.S.S.G. Manual app. C, amend. 747 (2010), an issue we discuss further below.

The only circuit case to have decided that the criminal livelihood enhancement requires a court to calculate a defendant's net income dealt with a materially different version of § 4B1.3, in effect between 1987 and 1989, which at that time required a court to find that a defendant "derived a substantial portion of his income" from criminal activity.  <u>See</u> <u>Lee</u> v. <u>United States</u>, 939 F.2d 503, 504 (7th Cir. 1991).[7]  The court reasoned that a

_____

[7]    We reject Gordon's suggestion that the court in <u>United States</u> v. <u>Manuel</u>, 912 F.2d 204 (8th Cir. 1990), which also applied

- 14 -

sentencing court applying that guideline needed to consider a defendant's criminal profits because it would be "absurd" to say that an individual who "earn[ed] $20,000 in his lawful 'day job' and net[ted] $10,000 on thefts of $1 million [in merchandise]" had engaged in crime as a livelihood.[8]   Id.

_____

the old version of § 4B1.3, implied a net-income requirement. There, unlike here, the government "concede[d] the point and admit[ted] there was no evidence . . . to suggest that [the defendant] profited" enough to justify the enhancement, and so the court did not state one way or another whether the guideline required a finding as to a defendant's "profits."   Id. at 208.   In any event, a subsequent Eighth Circuit case -- applying the current version of the guideline -- suggests that no such requirement exists.   See Morse, 983 F.2d at 853.

In United States v. Taylor, which applied the current version of the guideline, the court did cite Lee in passing for the proposition that "livelihood is a matter of net rather than gross income," but the court then proceeded to determine that the defendant had met the income threshold based on "[in]direct evidence" of his "receipts from stealing mail," without deducting expenses associated with his mail theft.   45 F.3d 1104, 1106-07 (7th Cir. 1995) (emphasis added).

While it is true that Lee was decided after the guideline was amended in 1989 (as well as after it was amended again in 1990 in an immaterial way), the court applied only the original version of the guideline, which governed the conduct at issue in that case, and so any statement reflecting that court's view of the amended version amounts to dicta.   See 939 F.2d at 504-05.

[8]      In Lee, a defendant who had pled guilty to a credit card fraud through which he had acquired $8,178.90 in merchandise, which he had subsequently chosen to sell for $1,000, was sentenced with the enhancement on the ground that his income from the fraud "greatly exceeded [the $750 he proved] he [had] earned from legitimate gainful employment."   Id.   In a petition for habeas relief, the defendant argued that he had received ineffective assistance due to his counsel's failure to present evidence that his legitimate income was actually $2,000.   Id.   In finding that the defendant had been prejudiced by this failure, the court concluded that only the $1,000 for which he had sold his $8,178.90 in stolen merchandise -- which the court deemed his "net income"

- 15 -

But Lee does not help Gordon. The guideline at issue in that case has been significantly amended, and the version applicable here includes two prongs: A court must first find that the defendant derived income from criminal activity in excess of a specified sum (equal to $14,500 at present), U.S.S.G. § 4B1.3 app. n.2(A), and then separately find that the criminal activity was the defendant's primary occupation, id. § 4B1.3 app. n.2(B).

The proper way of measuring the relative predominance of a defendant's criminal and legitimate income -- the issue on which Lee ruled -- has no bearing on the prong-one question of whether the defendant's criminal income exceeded the $14,500 threshold, the question at issue here. It is relevant, if at all, only to the prong-two question of whether criminal activity was the defendant's primary occupation.[9] Cf. United States v. Luster, 889 F.2d 1523, 1529 (6th Cir. 1989) ("A determination of whether a pattern of criminal activity provides 'a substantial portion' of one's income is a means of determining whether or not criminal

---

from the fraud -- should be measured against his $2,000 in legitimate earnings, and that based on that comparison, his legitimate earnings predominated. Id. The court did not indicate any need to deduct expenses associated with executing the credit card fraud or the resale.

[9] Gordon has not argued, and we do not decide, that a court must consider a defendant's net income in answering that distinct question. In any event, such an argument would be moot because, as we discuss below, Gordon was unable to establish that he derived even gross income in any meaningful quantity through noncriminal means during the relevant period.

- 16 -

conduct is one's primary occupation."); Kellams, 26 F.3d at 649.

Moreover, commentary on the reason why § 4B1.3 was amended in 1989 to include two prongs supports our reading of the guideline. See Fed. Sent'g L. & Prac. § 4B1.3 cmt. n.5 (explaining that the amendment intended to "simplif[y]" the analysis of a defendant's income).

It is also telling that the Commission amended § 4B1.3 again in 2010, when, as we have noted, the majority approach to the "income" issue was the gross-income approach. At that time, the Commission chose to leave the term "income," and therefore the precedents we cite, entirely undisturbed. See U.S.S.G. Manual app. C, amend. 747 (2010) (explaining that the Commission made merely cosmetic changes to the guideline in 2010 such as, inter alia, "striking '(1)' and inserting '(A)'; [] striking '(2)' and inserting '(B)'; and [] striking 'his' and inserting 'the defendant's'"). This amendment further supports our reading, and at a minimum, there is certainly no reason to view it as having adopted Lee, which addressed a meaningfully different version of the guideline.

Finally, the cases cited by Gordon that interpret the term "loss" in § 2B1.1 and the now-defunct § 2F1.1 as requiring a court to consider a crime victim's net losses do not bear on the meaning of the term "income" in § 4B1.3 app. n.2(A). See United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991); United

States v. Smith, 951 F.2d 1164, 1167-69 (10th Cir. 1991); United States v. Moore, 55 F.3d 1500, 1502-03 (10th Cir. 1995). Nothing in the text or history of § 4B1.3 suggests that the magnitude of the harm caused by a defendant's criminal activity is in any way related to the question of whether he engaged in that activity as a livelihood. And no authority supports the proposition that the meaning of a term in a guideline controls the definition of a different term in an unrelated guideline.

We find no error in the district court's interpretation of § 4B1.3 app. n.2(A), absent further clarification by the Commission. Even if we are wrong in reaching that conclusion, we affirm anyway, as the government's harmless error argument is correct. See, e.g., United States v. Tavares, 705 F.3d 4, 27-28 (1st Cir. 2013).

B.   Appeal from the District Court's Finding as to Gordon's Primary Occupation Under U.S.S.G. § 4B1.3 app. n.2(B)

We review a district court's application of a sentencing guideline to the facts before it only for clear error. United States v. Martin, 749 F.3d 87, 92 (1st Cir. 2014). "[A] sentencing enhancement must be supported by a preponderance of the evidence." United States v. Burgos-Figueroa, 778 F.3d 319, 320 (1st Cir. 2015) (citation omitted). Gordon's claim that the court erred in finding that drug trafficking, rather than some legitimate endeavor, was

his "primary occupation [during the relevant] twelve-month period," U.S.S.G. § 4B1.3 app. n.2(B), easily fails on this record.

The uncontested evidence presented by the government established that Gordon held a leadership role in a substantial drug-trafficking organization while living in Maine during the year preceding his arrest. The operation was sufficiently large to sell $89,480 in cocaine base over twelve months. Gordon actively participated in it, regularly communicating with his co-conspirators about the scheme and frequently executing transactions in furtherance of it. Additionally, in statements introduced by the government, an associate of Gordon's recounted that Gordon had told the associate that Gordon had come to Maine specifically to make money selling drugs in order to support himself and family members still living in Detroit, Michigan. See Quertermous, 946 F.2d at 378 (holding that an investigator's testimony that the defendant had admitted that he had resorted to a criminal activity in order to provide for himself, along with testimony regarding a co-defendant's statement that the defendant "was making his living from" that activity, supported the conclusion that the defendant's "primary occupation" was that activity).

In rebuttal, Gordon offered little more than his own attestations to support his contention that he had worked primarily as a self-employed barber. Gordon claimed that he had made between

$200 and $600 per week cutting hair, but he conceded that he had no documentation of any sort to verify either that work or those earnings. See, e.g., Luster, 889 F.2d at 1531 (rejecting a defendant's claim of legitimate employment at various part-time jobs because he was unable to provide supporting documentation); Quertermous, 946 F.2d at 378 (same, where the defendant claimed he had been legitimately "self-employed as a roofer" but was "unable to provide any records of employment").

The only evidence of legitimate employment that Gordon could muster were statements taken from a few of the letters submitted to the court in support of Gordon's character, which mentioned that Gordon had engaged in barbering at some point, sometimes for money, back when he had lived in Detroit. These statements did not indicate that Gordon had worked as a barber at all, let alone primarily, during the relevant time period. Meanwhile, an associate of Gordon's who had hosted Gordon at her residence in Maine overnight "from time to time" stated that she did not know what, if anything, he had done for legitimate work there.

In light of the abundant evidence that Gordon had actively participated in large-scale, lucrative drug-trafficking activities during the twelve months at issue and the dearth of evidence that he had performed any alternative work of comparable frequency or profitability over that period, the district court

was well justified in concluding that the primary-occupation prong of the criminal livelihood enhancement was satisfied. See Nastri, 647 F. App'x at 54 (affirming the district court's conclusion that the primary-occupation prong was satisfied where the evidence showed that the defendant had received "between $4,000 and $5,000" in proceeds from drug sales "five to seven times" and "no facts before the . . . court [showed] that [he had] held a primary occupation or employment other than his criminal drug enterprise"). There was no error on these facts.

## III.

Gordon's sentence is affirmed. We direct the Clerk to send a copy of this opinion to the Sentencing Commission.

**-Concurring Opinion Follows-**

**BARRON**, **Circuit Judge, concurring in the judgment**. The facts of this case do not require us to decide whether the word "income" in the "criminal livelihood" sentencing enhancement refers to the gross or to the net receipts of a defendant's criminal activity. For, as the majority well explains, however one construes the guideline, it would not affect the outcome in this case. Nevertheless, because the majority has weighed in on the issue of what "income" means, I wish to explain why I come out the other way.

The majority's reading of that word may be what the Sentencing Commission had in mind. It also might not be. I can see that there is room for debate about just how unclear the guideline is. In my view, though, the ambiguity is not superficial, but grievous. And because the rule of lenity dictates that enhancements in the United States Sentencing Guidelines may not be read broadly when they are this unclear, see Muscarello v. United States, 524 U.S. 125, 138–39 (1998) ("To invoke the rule [of lenity], we must conclude that there is a grievous ambiguity or uncertainty in the statute." (citation omitted)); see also United States v. Luna-Díaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000) (noting that the rule of lenity applies to the interpretation of

sentencing guidelines),[10] I believe we have no choice but to opt for the narrower "net" reading here.[11]

                                    I.

To start, there is no doubt that the word "income" could refer to either the gross or the net receipts of a defendant's criminal activity.  As the majority acknowledges, no dictionary -- legal or otherwise -- indicates to the contrary.

The guideline itself is of no help in resolving the ambiguity.  It does not set forth a definition of "income" of its

---

[10]    The defendant did not invoke the rule of lenity in making his case for the narrower, "net" reading that I would adopt.  But the only reason that we are offering a construction of the relevant provision of the Guidelines is to clear things up going forward. I thus see no reason to exclude from consideration this obviously relevant tool of construction.

[11]    The rule of lenity serves a number of functions, including the distinct one of ensuring that courts do not impose punishments because rulemakers have prescribed them unless the courts are certain that those punishments actually were prescribed.  See United States v. Bass, 404 U.S. 336, 348 (1971) (explaining that the rule of lenity is justified by the idea that, "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should." (citations omitted)).  Thus, in my view, the rule of lenity still applies to the Guidelines notwithstanding Beckles v. United States, No. 15-8544, 2017 WL 855781 (U.S. Mar. 6, 2017), which established that the vagueness doctrine does not apply to the Guidelines because vagueness in the Guidelines does "not implicate the twin concerns underlying vagueness doctrine -- providing notice and preventing arbitrary enforcement."  Id. at *8.

own. Nor does the guideline's application note make any direct reference to the word that might settle the matter.

I have looked at how the word "income" is used elsewhere in the Guidelines in hopes that such usage might clear things up. It does not. And it certainly does not show that "income" clearly means "gross income." The Guidelines mention the word "income" only a handful of times. In only one instance is the word modified. And, in that instance, the modifier is the word "gross." U.S.S.G. § 2T1.1 (referring specifically to the underreporting of "gross income"). That another guideline specifies "gross income" suggests, if anything, that the unmodified word "income" in this guideline means something else.

In consequence, the case for leaning on the rule of lenity seems to me to be quite strong. And, adding strength to that case is a Supreme Court precedent, United States v. Santos, 553 U.S. 507 (2008), that, though not controlling, is at least instructive.

The word in question in Santos was not "income" but "proceeds." And the relevant provision was a criminal statute (one that punishes money laundering), not a sentencing guideline. But the issue was otherwise virtually identical: whether "proceeds" referred to the gross receipts that a defendant derived from criminal activity or only to the net receipts. Id. at 511.

Five Justices in that case agreed that the word "proceeds" did not clearly refer to gross receipts. The plurality opinion that Justice Scalia wrote for four Justices relied on the rule of lenity in opting for a "net" reading of the term.[12] Id. at 514-25. Justice Scalia's logic has resonance here.

Justice Scalia explained that dictionaries provided no clarity as to whether the word "proceeds" referred to net or gross proceeds. Id. at 511-12. He then explained that the word had not "acquired a common meaning in the provisions of the Federal Criminal Code." Id. at 511-12. And, finally, he explained that context shed no light on the matter, because "[u]nder either of the word's ordinary definitions, all provisions of the federal money-laundering statute are coherent; no provisions are redundant; and the statute is not rendered utterly absurd." Id. at 513-14. He thus concluded that the statute was ambiguous, and that the rule of lenity must therefore control. Id. at 514.

In reaching this conclusion, Justice Scalia was well aware that the "net" receipts definition would be tough to administer -- much tougher, that is, than a gross receipts

---

[12] Justice Stevens declined to join the plurality opinion, writing that "proceeds" may mean "net" in some circumstances and "gross" in others. Santos, 553 U.S. at 525 (Stevens, J., concurring in judgment). Justice Stevens did, however, agree with the plurality that Congress would not have intended "proceeds" to mean "gross" in the case at hand. Id. at 527-28.

definition.  Id. at 519.   How, after all, would one decide which expenses counted?  And how would the government be in a position to know what the true expenses of the criminal activity were?  Would the defendant's assertions in this regard just have to be credited?

But while these were points that the government pressed hard, id., they were not points that moved the plurality, even though Congress had offered no guidance as to how net receipts were to be determined.  In rejecting the notion that such practical concerns justified a broad reading of "proceeds," Justice Scalia pointed out that there is no tie-breaking principle that counsels judges to construe unclear statutes in the manner that best facilitates the imposition of criminal punishment.  Rather, he pointed out that the longstanding interpretive presumption is just the opposite: that ambiguous criminal measures are to be construed narrowly to protect defendants.  Id. ("We interpret ambiguous criminal statutes in favor of defendants, not prosecutors.").

II.

Of course, even ambiguous words, in context, may acquire a clear-enough meaning that it would be improper to apply the rule of lenity.  But we know that the plurality in Santos thought it appropriate to use this longstanding interpretive tool to determine whether "proceeds" referred to net or gross receipts.  To me, therefore, the question is simply whether there is any good

reason to proceed differently here.  In my view, there is not, especially considering this guideline's history.

An earlier version of the "criminal livelihood" guideline imposed an enhanced sentence if the defendant derived a "substantial portion of his income" from his criminal conduct. U.S.S.G. § 4B1.3 (amended 1988).  The Seventh Circuit, per Judge Posner, read the word "income" in that iteration of the guideline to refer to net rather than gross receipts.  Lee v. United States, 939 F.2d 503, 504 (7th Cir. 1991).

Judge Posner's reasons for doing so are persuasive to me.  Judge Posner explained that the word "income" in that version of the guideline "[s]urely" had to be read to refer to net income, id., else the following absurd consequence would arise.  He posited a defendant who grossed $1 million in sales a year from a legitimate business, but netted only $10,000, and who burgled $20,000 by night with no expenses.  Judge Posner noted that such a defendant would not be thought to have "derived a substantial portion of his income" from his crimes if measured by comparing his gross legal income ($1 million) against his gross illegal income ($20,000).  Id. (quoting the version of § 4B1.3 in effect at the time the defendant was sentenced).  In addition, Judge Posner pointed out, if the defendant earned $20,000 from a lawful day job and netted only $10,000 on thefts of goods worth $1 million in retail value, his sentence would be enhanced -- again,

incongruously -- if his income were measured by comparing his gross legal income ($20,000) to his gross illegal income ($1 million). Id. No such strange results would follow, however, if "income" were simply read to refer to net receipts.

Judge Posner also emphasized that, although a defendant's gross criminal income may be the more relevant figure for purposes of measuring the amount of harm that the defendant's criminal activity caused, there are other provisions in the Guidelines that are intended to respond to the magnitude of the harm caused by the offense. Id. As the criminal livelihood enhancement, however, "Section 4B1.3 has the narrower office of separating professionals from amateurs on the basis of the extent to which a defendant derives his livelihood from his criminal as distinct from his legal activities." Id. And, as Judge Posner concluded, "livelihood is a matter of net rather than gross income." Id.[13]

---

[13] I note that U.S.S.G. § 2T1.4 also uses the same "substantial portion of his income" language as did the version of the guideline Judge Posner construed. Specifically, § 2T1.4 provides for an enhancement where a defendant provided "aid, assistance, procurance, or advice" regarding tax fraud "as part of a pattern or scheme from which he derived a substantial portion of his income." As best I can tell, no cases have yet considered whether "income" in this provision refers to gross or net receipts, though it would appear that Judge Posner's analysis would have equal force in construing the term.

The majority does not take issue with Judge Posner's explanation of why "income" had to mean net income in the first iteration of this guideline. The question is thus whether the guideline has been changed in a way that indicates with sufficient clarity that this word now must be understood to refer to gross income. I do not believe it has.

In coming to this conclusion, I recognize, as the majority notes, that, in 1990, the Sentencing Commission did amend the version of the guideline that Judge Posner was construing. And the first set of those amendments was extensive.

The guideline no longer defines criminal activity as a "livelihood" simply because the defendant "derived a substantial portion of his income" from "a pattern of conduct" of which crime was a part. Rather, the guideline's definition of "livelihood" now has two distinct parts. The first part requires that the defendant derived income from his criminal conduct "that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law." U.S.S.G. § 4B1.3 app. n.2(A). The second part requires that "the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct)." Id. § 4B1.3 app. n.2(B).

- 29 -

But I do not see how these changes -- significant though they are -- make it clear that "income" now refers to gross income, given that it is most unlikely that this word did so before. I note in this regard that Judge Posner was well aware of these amendments when he wrote his decision in Lee, in which he construed "income" to mean net income. He, too, did not conclude that the amendments reflected a shift in the Commission's view. Rather, he concluded that these amendments "dispelled" "[a]ny doubts" about whether the Commission intended "income" to refer to net rather than gross earnings. Id. at 504.

Judge Posner based that conclusion on the fact that the amendments keyed the amount that a professional criminal must make in a twelve-month period to the annual income of a minimum wage worker, rather than to some other amount. See id. at 504-05. Presumably, Judge Posner thought such a choice by the Commission -- by analogizing the criminal defendant to a lawful earner who makes a minimum wage -- only served to underscore his basic point: that the focus of this guideline is on whether the defendant makes a livelihood from criminal activities, and not on whether those activities cause great harm. Thus, a reading of the word "income" that ensures that the inquiry focuses on what a criminal defendant takes home, rather than on merely what he takes in, makes the most sense.

That said, I would not go so far as Judge Posner and conclude that the new guideline -- by referencing the annual income of a minimum wage worker -- demonstrates beyond all doubt that the Commission is focused on net rather than gross income. I am confident, however, that the amended guideline, by choosing to key income to the annual earnings of a minimum wage worker, cannot be said to have adopted in any clear way a "gross" view of income that the earlier iteration of the guideline had declined to embrace.

The new guideline, after all, uses the same word -- "income" -- as did the previous version of the guideline. And the amendments added no modifier to clarify that otherwise ambiguous word's meaning. Nor does the application note to the amended guideline provide any clarification.

In addition, because minimum wage workers, unlike many criminals, usually incur few expenses, it seems quite plausible that, in amending the guideline, the Commission still had in mind the criminal's profit from his work rather than his gross income. After all, a drug dealer who buys drugs and then sells them at, say, a 30% mark-up, may surpass the guideline's threshold income amount in gross earnings even if he will never succeed in earning an actual livelihood from his net profits. Why, then, does it

make sense to apply a "livelihood" enhancement to a defendant simply because of the amount of his gross unlawful earnings?[14]

Moreover, it would hardly be unthinkable for the Commission to have chosen to target only those criminals who actually succeed at making a living through crime. Deterrence is specially needed for that class of criminals, due to their special propensity to persist in a life of crime. And there is no doubt that the guideline's raison d'être was to deter professional

---

[14] It is true that the hourly minimum wage is a pre-tax figure, but that hardly indicates that the Commission intended for courts to ignore a defendant's expenses in determining whether a defendant has made a living through crime. Tellingly, this guideline is "derived from" the (now repealed) Dangerous Special Offender statutes, 18 U.S.C. § 3575(e)(2) and 21 U.S.C. § 849(e)(2), and was intended to "embody[] the same considerations" as those statutes. See S. Rep. No. 98-225, at 176, 120 (1983). Those statutes instructed courts to determine whether the defendant derived a "substantial source of income" from criminal activity as compared to the defendant's lawful "adjusted gross income." And "adjusted gross income" is a pre-tax figure that takes account of business expenses.

Moreover, it would surely be a surprise if there are many minimum wage workers who -- like many criminals, and those involved in the drug trade in particular -- have expenses so substantial that they may swallow up their earnings. In fact, the Fair Labor Standards Act (FLSA) specifies that wages must be paid "free and clear." 29 C.F.R. § 531.35. Thus, such expenses as uniforms and, in some cases, even travel, cannot be charged to the employee, if such expenses would drive the employee's pay below minimum wage. See Arriaga v. Florida Pac. Farms, L.L.C., 305 F.3d 1228, 1236-37 (11th Cir. 2002) (explaining that the "free and clear" provision requires employers to reimburse employees for expenses that are primarily for the benefit of employers, including tools and uniforms, and that employers cannot avoid this rule by simply requiring employees to make such purchases on their own); see also Rivera v. Peri & Sons Farms, Inc., 735 F.3d 892, 897 (9th Cir. 2013) (requiring H-2A visa employees to pay for their own inbound travel and visa expenses violates "free and clear" rule).

criminals, given that this was the rationale of the Dangerous Special Offender statutes from which the guideline was derived. See United States v. Kerr, 686 F. Supp. 1174, 1178, 1180 (W.D. Pa. 1988) (noting that "Congress adopted [§ 4B1.3] from the Dangerous Special Offender statutes," and that those statutes were intended to "impos[e] enhanced punishment to incapacitate professional criminals who may lack the prior convictions necessary to bring them within recidivist statutes"); id. at 1180 ("The requirement that [defendants] derive a substantial portion of their income from this pattern furthers the legitimate purpose of incapacitating professional criminals . . . . The defendant who has an income to which crime does not contribute a substantial portion does not depend on crime; his prospects for returning to a legitimate lifestyle may be better.").[15]

---

[15]    Those statutes applied additional punishment where a defendant was convicted of a crime as part of a pattern of criminal conduct "which constituted a substantial source of his income." 18 U.S.C. § 3575(e)(2); 21 U.S.C. § 849(e)(2).  The statutes defined a "substantial source" as an amount which exceeds the annual minimum wage and exceeds half of the defendant's declared adjusted gross income (that is, net income by another name). Id. The fact that Congress specified that lawful earnings should be measured by "adjusted gross income," while unlawful earnings should be measured by "income," left unclear just how "income" -- full stop -- is to be measured.  But, even if "income" meant gross income, due to its contrast with the more specific "adjusted gross income," the guideline in its initial form -- by using the word "income" alone, and thus without any contrast to "adjusted gross income" -- could only have been referring to net income for the reasons that Judge Posner gives.  Thus, nothing in the way the word "income" was used in the precursor statutes clears things up with respect to what the word means in the guideline.

Finally, I note that the Commission in 2010 actually amended the guideline yet again. And this time the Commission did so with the benefit of the analysis of the word "income" that Judge Posner had offered in his 1991 decision in Lee. U.S.S.G. § 4B1.3 (amended 2010). At that time, Lee was the only court of appeals decision to have definitively construed the word "income" in connection with the criminal livelihood guideline -- though, as the majority points out, a number of circuits had applied the gross income approach without having any need to consider whether the gross or the net definition of "income" was intended in either the earlier or the amended version of the guideline. And, as I have explained, Lee had not only construed the word "income" in the first iteration of the guideline to mean net income but also had concluded that the 1990 amendments made crystal clear the correctness of that narrow construction. Yet, in making the 2010 amendments, the Commission saw fit to retain the same word "income" that had been there all along, and to do so without adding any clarifying modifier.

In light of this history, I do not see how we could have any confidence that the word "income" in the guideline, as it now stands, refers to gross income. To so conclude, we would have to be confident that the Commission retained a word that is facially ambiguous, but that the Commission nonetheless impliedly intended to give that word a new meaning that is the opposite of what the

only circuit court ever to have definitively construed that word had read it to mean.

### III.

A key idea behind the rule of lenity is that judges should be wary of mistakenly imposing punishment on the basis of rules that have been drawn up by others but that were never intended to reach so far as judges may be asked to extend them. And, in this context, that idea seems to me to have particular force.

The Commission has already proved itself to be more than capable of revising the guideline. The Commission is free to do so again. It might even do what Congress did in response to Santos -- expressly state that it had in mind the gross amount. See 18 U.S.C. § 1956(c)(9) (clarifying that "the term 'proceeds' means any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity"). And it might take that step in response to the practical concerns that the majority quite reasonably raises.

It may also be, however, that the Commission is not troubled by such concerns. In many cases, after all, a criminal's expenses will not be hard to figure, if there are even any to be calculated. And courts have accepted that the Commission requires them to make similar calculations under other guidelines -- namely

the guidelines that key sentences for crimes of theft, fraud, and deceit to the amount of the victim's "loss." See, e.g., United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991); United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991). Moreover, big-time but unsuccessful criminals hardly receive lenient treatment under the other guidelines that would apply to them. Thus, it is not obvious that the Commission intends for this particular guideline to apply to such criminals. It seems quite possible the Commission's focus here was on a distinct group -- namely, those defendants for whom a life of crime pays. And thus it seems quite possible that the Commission did not intend to impose this additional enhancement upon a defendant who made no living off of crime at all.

But whatever the Commission's view actually is, the basic point is this: the Commission has failed to speak with the clarity that we demand before we construe legal texts in a manner that would subject persons to additional criminal punishment. As a result, I would not apply the guideline as broadly as the majority would. I would instead leave the task of clarifying its breadth to the Commission.