UNITED STATES of America, Appellee,

v.

Peggy J. HEARRIN, Appellant.

UNITED STATES of America, Appellee,

v.

William H. HEARRIN, Jr. a/k/a Bill Hearrin, Appellant.

Nos. 89–1020, 89–1132.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1989.

Decided Jan. 3, 1990.

757

JOHN R. GIBSON, Circuit Judge.

Peggy Hearrin and William H. Hearrin, Jr. pled guilty to conspiring to commit mail fraud in violation of 18 U.S.C. § 371 (1982) and were sentenced pursuant to the United States Sentencing Guidelines. The only issues in this appeal involve the application of the Guidelines. Both argue that the district court[1] erroneously held, under section 2F1.1 of the Guidelines, that they had engaged in "more than minimal planning." Peggy Hearrin also asserts that the district court erred in concluding that the offense in question was part of a pattern of criminal conduct from which she derived a substantial portion of her income, as defined in section 4B1.3 of the Guidelines. We affirm the sentences imposed by the district court.

The parties entered into a Stipulation of Facts Relevant to Sentencing, which we recite in part. William Hearrin was employed as a Regional Sales Manager for Coca–Cola Foods. He and his wife, Peggy Hearrin, used a fictitious company name, Buy Rite, for the purpose of receiving fraudulent payments from Coca–Cola. They rented a post office box in Chesterfield, Missouri, in the name of Buy Rite. William Hearrin, with the assistance of his wife, then submitted to Coca–Cola fraudulent Promotion Payment Request forms and Unsaleable Product forms falsely indicating that Coca–Cola owed money to Buy Rite. The forms were mailed to Coca–Cola's Houston office, and Coca–Cola then mailed checks payable to Buy Rite to the post office box in Chesterfield. William Hearrin, with his wife's assistance, then either deposited the checks into a bank account which they had opened in Buy Rite's name, or otherwise negotiated the checks for personal expenditures. William Hearrin also fraudulently completed Performance Payment drafts payable to Buy Rite or other businesses and then negotiated these drafts on behalf of himself or his wife.

Michael Dwyer, St. Louis, Mo., for P. Hearrin.

Lynn Travis, Alton, Ill., for W. Hearrin.

Michael Fagan, St. Louis, Mo., for appellee.

Before JOHN R. GIBSON and FAGG, Circuit Judges and FLOYD R. GIBSON, Senior Circuit Judge.

1. The Honorable Edward L. Filippine, United States District Judge for the Eastern District of Missouri.

The Hearrins' fraudulent activity was extensive. Between October 5, 1987 and May 5, 1988, William Hearrin prepared at least fifty-one Performance Payment drafts, each in the amount of $500 or less. The Hearrins completed at least six Unsaleable Product forms between October 27, 1987 and December 4, 1987. They submitted at least eleven Promotion Payment Request forms between October 28, 1987 and February 29, 1988. Finally, they completed at least two Customer Adjustment Request forms between March 18, 1988 and April 15, 1988. All of these forms bore false and fraudulent information. Checks in the approximate amount of $129,404 were issued to Buy Rite during the period in question. It was stipulated that William Hearrin was the organizer or leader of the criminal activity and that Peggy Hearrin was a minor participant.

After the guilty pleas and during the sentencing process, both Hearrins objected to the application of Guideline section 2F1.-1(b)(2), which increases the offense level by two levels if the offense involved more than minimal planning. At the sentencing hearing for William Hearrin, the court found that there was more than minimal planning because of the number of transactions involved. (Tr. Sentencing of William Hearrin, E.D.Mo., Dec. 9, 1988, at 20–21). In sentencing Peggy Hearrin, the court noted that the crime had extended over a period of eight months, and involved participation in many transactions and the renting of a post office box. Accordingly, the court concluded that she had engaged in more than minimal planning. (Tr. Sentencing of Peggy Hearrin, E.D.Mo., Dec. 9, 1988, at 7).

Peggy Hearrin also objected to the application of Guideline section 4B1.3, which requires a minimum offense level of thirteen, or eleven if acceptance of responsibility applies, if the offense was committed "as part of a pattern of criminal conduct engaged in as a livelihood." At the sentencing hearing, the court stated that her objection was not directed to the "substantial portion of income" provision of the section, see U.S.S.G. § 4B1.3, comment. (backg'd.), but rather identified her objection as challenging that there was no "pattern of criminal conduct." (Tr. Sentencing of Peggy Hearrin, E.D.Mo., Dec. 9, 1988, at 15, 18). After extensive argument by both counsel, the court concluded that the plain meaning of the words "pattern of criminal conduct" meant planned criminal acts occurring over a substantial period of time.[2] The court then found that, although Peggy Hearrin did not have a history of criminal involvement over a long period of time other than this offense, this crime involved both planned criminal acts and a substantial time period of eight months. The court concluded that she had engaged in a pattern of criminal conduct. (Tr. Sentencing of Peggy Hearrin, E.D.Mo., Dec. 9, 1988, at 19–20).

Based upon these findings, the court sentenced William Hearrin to twenty-one months imprisonment and Peggy Hearrin to four months imprisonment.

I.

On appeal, Peggy and William Hearrin argue that they had not engaged in "more than minimal planning" and, therefore, section 2F1.1, dealing with offenses involving fraud or deceit, does not mandate an increase of two levels over the base offense level of six. The Guidelines define "more than minimal planning," in part, as follows:

"More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense.

"More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

. . . .

2. The Guidelines so define this phrase. U.S.S.G. § 4B1.3, comment. (n. 1).

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, *creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.*

U.S.S.G. § 1B1.1, comment. (n. 1(f)) (emphasis added).

In light of this definition and the record before the district court, the court did not err in its application of the "more than minimal planning" guideline. The facts in the stipulations fully satisfy the Guidelines' definition set forth above. Over an eight-month period, the Hearrins created a fictitious business name, opened both a post office box and a bank account in that name, and submitted fraudulent payment requests or completed fraudulent drafts resulting in seventy payments totalling approximately $129,404. While the Guidelines' illustration refers to embezzlement and not to mail fraud, the references to establishing a dummy corporation and obtaining money through false bookkeeping entries are certainly instructive in this case.

Despite these stipulations and the Guidelines' definition, the Hearrins argue that the court erred in finding more than minimal planning because the government failed to establish a benchmark against which to measure their conduct. They also argue that because mail fraud necessarily involves several acts and is never impulsive or unplanned, the court's reasoning leads to the inevitable conclusion that *all* mail fraud crimes will involve "more than minimal planning." Finally, they argue that the phrase "more than minimal planning" is inherently ambiguous and therefore, they are entitled to lenity in the court's interpretation of the Guidelines.

We are satisfied that the Guidelines themselves establish a benchmark for measuring the extent of the Hearrins' planning, as they define "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form." *Id.* We do not believe that more in the nature of a benchmark or standard is required. The Hearrins' argument that mail fraud is inherently complex and necessarily involves more than a single act overlooks our holding that conspiracy to commit mail fraud requires only a single overt act. *United States v. Andrade,* 788 F.2d 521, 525 (8th Cir.), *cert. denied sub nom. Riley v. United States,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986).

The Hearrins' activities, including the falsification of a large number of documents, the opening of both a post office box and a bank account under a fictitious name, and the receipt of a large sum of money, certainly involved more planning than is typical for commission of mail fraud conspiracy in a simple form.

The Guidelines' definition and illustrations provide further support for this conclusion by stating that more than minimal planning exists if the offense involved repeated acts over a period of time unless each instance was purely opportune. *See* U.S.S.G. § 1B1.1, comment. (n. 1(f)). Here, the Hearrins' fraudulent acts were repeated some seventy times over an eight-month period, and plainly, each instance was not merely opportune.

■ Their argument that, as a matter of law, there is no unambiguous definition of the phrase "more than minimal planning" and that they are therefore entitled to lenity in the interpretation is equally unavailing. The Guidelines not only define the phrase with clarity but also provide helpful illustrations, as indicated by the excerpt previously set forth. *See id.*

Our review of the record reveals that the district court did not err in applying section 2F1.1. We affirm the court's increase in the base offense level by two levels in sentencing the Hearrins.

### II.

■ Peggy Hearrin asserts that the district court also erred in applying section 4B1.3 based on the determination that she engaged in a pattern of criminal conduct as

her livelihood. This was significant because the district court's rulings as to Peggy Hearrin resulted in a Guideline range of eight to fourteen months imprisonment. Since this range exceeded six months, it precluded the possibility of sentencing her solely to probation and mandated that she serve a prison term.

In challenging the court's ruling as to section 4B1.3, she argues that the Guidelines ambiguously define the phrase "pattern of criminal conduct." She identifies the origin of this criminal livelihood section as 28 U.S.C. § 994(i)(2), in which Congress directed the Sentencing Commission to ensure a substantial term of imprisonment where the defendant "committed the offense as part of a pattern of criminal conduct from which he derived a substantial portion of his income." *Id.* She argues that the legislative history of section 994(i)(2) reveals that Congress' purpose was to enhance the punishment of professional criminals and recidivists. She asserts that the evidence shows she is neither a professional criminal, since she has no prior convictions and played only a minor role in the offense, nor is she likely to be a recidivist. Furthermore, she asserts that her criminal conduct did not occur over a "substantial period of time." According to her, she was simply a thirty-one year old minor participant in a crime lasting eight months.

We are unconvinced by these arguments. It is true that section 994(i)(2) was derived in part from the dangerous special offender provisions of 18 U.S.C. § 3575(e) and the dangerous special drug offender provisions of 21 U.S.C. § 849(e); however, this does not lead to the conclusion that Congress intended to "adopt the ... earlier acts in toto." *United States v. Nolder*, 887 F.2d 140, 144 (8th Cir.1989) (John R. Gibson, J., concurring). We do not read the earlier statutes as mandating the requirements urged by Peggy Hearrin. The district court carefully considered the meaning of the phrase "pattern of criminal conduct" and determined that it covered the offense

here which involved a single course of conduct and did not require conviction of another crime. Peggy Hearrin's argument, when stripped to its essence, is a factual one based upon her characterization of herself as neither a professional criminal nor a recidivist. This argument does not reach the terms and definitions in the Guidelines and does not convince us that the district court erred.

The district court considered section 4B1.3 in detail, including its definitions of terms,[3] and based its conclusion not only on the fact that the criminal conduct continued over eight months but also on the extensiveness of the planned activities during that time period. It is not relevant to this determination that Peggy Hearrin was only thirty-one years old at the time of her offense. It is relevant, however, that together the Hearrins received an average of $16,000 per month over the eight-month conspiracy, and that Peggy Hearrin provided assistance throughout this fraudulent scheme. The extent of her involvement over this substantial time period supports the district court's conclusion that her offense was a part of a pattern of criminal conduct engaged in as her livelihood.

We are satisfied that the district court did not err in applying section 4B1.3 of the Guidelines to Peggy Hearrin or in concluding that her stipulated actions fit within the definitions of the Guidelines.

### III.

Accordingly, we conclude that the district court did not err in finding that both Hearrins had engaged in "more than minimal planning," under section 2F1.1, and that Peggy Hearrin committed her offense "as part of a pattern of criminal conduct engaged in a livelihood," under section 4B1.3. We affirm the sentences imposed by the district court.

---

**3.** This section defines "pattern of criminal conduct" as "planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses." U.S.S.G. § 4B1.3, comment. (n. 1).