**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alan LEVINSON, Defendant–Appellant.**

**No. 94–3660.**

United States Court of Appeals,
Seventh Circuit.

Argued April 27, 1995.

Decided May 30, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied
July 12, 1995.

Barry Rand Elden, Asst. U.S. Atty. and Jeanne Witherspoon (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

William J. Stevens (argued) and Barry D. Sheppard, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and CUMMINGS and BAUER, Circuit Judges.

POSNER, Chief Judge.

■ Alan Levinson pleaded guilty to one count of mail fraud (18 U.S.C. § 1341) and was sentenced to 12 months in prison and fined $20,000. His brief on appeal challenges the sentence on two grounds, but at oral argument his counsel abandoned the second, which was that the district judge should have explained why she was sentencing Levinson to 12 months in prison rather than, as he requested, to a year and a day, which, he argues, whether rightly or, probably, wrongly, see Phylis Skloot Bamberger & David J. Gottlieb, *Practice Under the Federal Sentencing Guidelines* § 7(B)(2)(c) (3d ed. 1993 & Supp.1994), would have made him eligible for goodtime credits that would have shaved 54 days off his sentence. Since 12 months was within the guidelines range for Levinson's offense and that range did not exceed 24 months, the judge owed no explanation for picking that number rather than another within the range. 18 U.S.C. § 3553(c)(1); *United States v. Garrido*, 38 F.3d 981, 986 (8th Cir.1994); *United States v. Caterino*, 29 F.3d 1390, 1397 (9th Cir.1994); *United States v. Lively*, 20 F.3d 193, 198 (6th Cir.1994).

Levinson's other ground for challenging his sentence is that he should not have received an enhancement for "more than minimal planning." U.S.S.G. § 2F1.1(b)(2)(A). We must consider what exactly the term means in the context of mail fraud. The facts are colorful, and not in dispute. Levinson had bought a fancy horse named Rainman for his daughter to ride and enter in horse shows, and had insured the animal for $50,000. The horse sustained an injury that, though minor (the fracture of a small bone in

the part of the back on which the saddle sits), made the horse unsuitable for exhibition riding. Levinson asked Michael Hunter, on whose recommendation he had bought the horse and who had trained it and had given Levinson's daughter riding lessons, to sell the horse. Hunter tried, but could not find a buyer at an acceptable price. Levinson then decided to get rid of Rainman and collect the insurance proceeds. One might have expected him to file a claim with the insurance company based on the horse's injury—but he did not discover the injury until after the horse's death. All he knew till then was that the horse could not be ridden well enough for exhibition riding.

Levinson told Hunter to "do what you have to do" with the horse. Hunter said he could "make the horse disappear" for $5,000. Levinson agreed. Hunter hired Tim Ray, a professional horse killer fairly describable as "notorious," see Matt O'Connor, "Horse Owner Gets 90 Days for Role in Insurance Scam," *Chicago Tribune*, April 28, 1995, § 2, p. 2, to kill Rainman for $2,500. Ray transported the unfortunate Rainman from Hunter's stable in Illinois to St. Louis, and there killed Rainman by electrocution, the details of which are happily omitted from the record. Levinson submitted a claim for the loss of Rainman to the insurance company, half-truthfully reporting that the horse had been found dead in its stall in a barn in St. Louis. The insurance company sent Levinson a check for $50,000, who then paid $5,000 to Hunter as agreed, in small denominations to minimize the risk of tracing. Hunter remitted half to Ray. All this took place in 1989. Three years later Ray, by this time finally arrested, spilled the beans on Levinson, who when approached by the FBI lied about his participation in the crime and tried to persuade Hunter to lie as well.

■ For a crime so cruel and gratuitous committed by a member of the affluent class (the presentence investigation report reveals that Levinson's net worth is almost $2 million), a sentence composed of so small a fine and so short a prison sentence strikes us as too lenient. But we must set our personal feelings about the sentence to one side, and consider the question of whether more than minimal planning was involved with all the gravity that we would muster if Levinson had been sentenced to 12 years rather than 12 months. His argument is that all he did, besides mail the claim to the insurance company, was tell Hunter to get rid of the horse; and if that is not minimal planning of a mail fraud, what is? There was a little more to what he did—the payment to Hunter of the $5,000, in small denominations, but paying the person you hire is implicit in the hiring, and if the hiring is not enough to cross the threshold of more than minimal planning then neither we assume is the payment or the breaking of it up into small bills. Integral to the fraud, it is true, was the destruction of the horse, and that involved more than minimal planning. Killing a horse is not so simple as killing a mouse. Hunter had to find and negotiate with a horse killer, who in turn had to transport the animal to a suitable place of execution; and even without knowing the details of Rainman's demise, we feel safe in assuming that electrocuting a horse is a more complicated procedure than shooting it. But Levinson did not participate in the planning of the destruction of the horse; he left all that to Hunter.

■ We do not think it makes any difference. The sentencing guidelines define "more than minimal planning" as "more planning than is typical for commission of the offense in a simple form." U.S.S.G. § 1B1.1, Application Note 1(f). The focus is on the planning involved in the offense rather than on the planning done by the particular offender. This semantic point is hardly conclusive; two other considerations are more important. The first is the basic principle of agency. In criminal as in civil law, the acts of an agent are very often, though not always, attributed to the principal. Levinson's lawyer described Hunter as an "independent contractor." Fair enough; Levinson hired him to produce a specified result rather than to accept supervision from Levinson as an employee would. But it would be very curious, given the criminal law's disapprobation of organized criminal activities, to encourage criminals to operate through agents rather than personally, by giving them a sentencing discount. It is bad enough that criminals

should seek insulation from liability by operating through underlings to the details of whose activities the criminal principal virtuously shuts his eyes. It would be worse if the sentencing guidelines gave a break to the criminal who leaves the details to others. They do not. The foreseeable conduct of an accomplice is attributable to the principal under the rubric of "relevant conduct." U.S.S.G. § 1B1.3(a)(1)(B). So Levinson was liable for the eminently foreseeable conduct by which Hunter, through the hiring of the professional horse killer, got rid of Rainman.

Our second point relates to the purpose behind increasing the punishment for offenses involving more than minimal planning. The commission of a crime on the spur of the moment—an example from mail fraud would be simply inflating a valid insurance claim—is less dangerous, other things being equal, than the commission of a crime pursuant to a more or less elaborate plan. Planning implies foresight, and criminals who operate with foresight are more dangerous than impulsive criminals. The latter are easier to catch, and the former are capable of doing more harm, regardless of how much they happened to do in the particular case. U.S.S.G. § 2F1.1, third paragraph of background commentary; *United States v. Scurlock*, 52 F.3d 531, 540–541 (5th Cir.1995); *United States v. Massey*, 48 F.3d 1560, 1570 (10th Cir.1995); *United States v. Monaco*, 23 F.3d 793, 797 (3d Cir.1994); cf. U.S.S.G. § 2B1.1, second paragraph of background commentary; *United States v. Wong*, 3 F.3d 667, 672 (3d Cir.1993). They are also more likely to involve more people in their criminal activities, as happened here. Suppose Levinson had not had Rainman killed, but had simply exaggerated his injury in a claim filed with the insurance company. That would be an example of a mail fraud involving minimal planning. *United States v. Scurlock, supra*, 52 F.3d at 540–41; *United States v. Moored*, 997 F.2d 139, 145 (6th Cir.1993); cf. *United States v. Brown*, 7 F.3d 1155, 1160 (5th Cir. 1993); *United States v. Starr*, 986 F.2d 281, 282 (8th Cir.1993) (per curiam). (And we agree that there is such a thing—that mail, or other, fraud is not inherently so complex as to require more than minimal planning, in which event an upward adjustment for more than minimal planning would involve double counting. *United States v. Hearrin*, 892 F.2d 756, 759 (8th Cir.1990).) The insurance company could more easily have discovered the fraud, and the fraud would have involved one person rather than three.

Although Levinson was not personally involved in the detailed planning, the action that he took in setting the scheme into motion—the hiring of Hunter—was hardly in the nature of an impulsive act, and we do not think his guilt is mitigated by the fact that he left the details to his agent. We note that hiring an accomplice has been cited in a number of other cases of fraud as indicative of more than minimal planning. E.g., *United States v. Lennick*, 917 F.2d 974, 976, 979 (7th Cir.1990); *United States v. Mizrachi*, 48 F.3d 651, 657 (2d Cir.1995); *United States v. Ivery*, 999 F.2d 1043, 1046 (6th Cir.1993).

AFFIRMED.