92 F.3d 1188
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sandra WRIGHT, Defendant-Appellant.
 No. 95-3350.
 United States Court of Appeals, Seventh Circuit.
 Argued May 24, 1996.
Decided July 30, 1996.
 
 Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Sandra Wright was convicted by a jury on one count of bank fraud in violation of 18 U.S.C. § 1344. The district court sentenced Wright to a prison term of fifty-one months under the Sentencing Guidelines, and in this appeal, she challenges three aspects of that sentence. Finding no error, we affirm.
 
 I.
 
 2
 Sometime between December 13 and 15, 1994, Wright phoned Robert Bond, a family friend, at his home. Bond was the manager of the Town and Country Branch of the Society National Bank ("Society") in South Bend, Indiana, and at the time, he was home on a two-week vacation from the bank. Wright told Bond that she would soon be receiving a check for an insurance settlement, and although she did not then have an account with Society, she asked Bond about the procedures for obtaining the funds once she received the check. Bond told Wright that once the check was deposited, the bank would place a ten-day hold on the account to ensure that the check cleared. Near the end of their conversation, Bond told Wright that he would not be back to work until the following week.
 
 
 3
 On December 23, 1994, Wright appeared at Society's Town and Country Branch with a $115,000 check drawn on the account of the Arkansas Employment Security Department Disability Compensation Fund. Bond recalled that Wright had earlier characterized the check as an insurance settlement, and he therefore questioned her when he saw that it was not. Wright told Bond that she had sued the State of Arkansas and that the check represented the proceeds from her suit. Bond asked whether an award letter or stub of some type had accompanied the check, and Wright said that she had a letter but that she had left it at home.
 
 
 4
 Wright then said that she wanted to open an account and to deposit the check. She also wished to meet with someone at the bank about investing her money. Bond proceeded to open a savings account in Wright's name, and although she was aware of the "ten-day hold" rule, Wright declared, "I know you're going to give me some of this money." When Bond asked how much she wanted, Wright explained that it was Christmas and that without a portion of the money, she and her family would have no Christmas. Wright asked Bond for $5,000, and he eventually agreed to give her $2,500. Before doing so, however, Bond attempted to verify the validity of the check by calling the State of Arkansas, but he reached only an automated answering service.
 
 
 5
 Society apparently never implemented the ten-day hold, because on the following day (December 24), Wright went to Society's Western Avenue Branch, which was on the other side of town from the Town and Country Branch, and withdrew $5,200 from the new account. The bank was closed the following two days for the Christmas holiday, but it reopened on Tuesday, December 27. On that day, Wright returned to the Western Avenue Branch and asked to withdraw $52,000. She initially requested the entire amount in cash but settled on $42,000 in cash and a $10,000 cashier's check made out to her attorney.
 
 
 6
 At the same time that Wright was making her December 27 withdrawal, Bond was continuing his attempt to verify Wright's $115,000 check. He eventually spoke to Darlene Meeks, the accounting supervisor for the Arkansas Employment Security Department, and learned that Wright's check was a fraud. Bond informed his supervisor, and Security placed a stop-payment order on the $10,000 cashier's check and notified all branches of what had occurred.
 
 
 7
 Two days later, on December 29, Wright returned to the Western Avenue Branch and attempted to withdraw $5,000 from her account. The teller stalled Wright until the FBI arrived to arrest her.
 
 II.
 
 8
 In sentencing Wright, the district court assigned her a base offense level of six pursuant to U.S.S.G. § 2F1.1(a) and then added six additional levels after finding that the loss attributable to Wright's fraud was $115,000. See U.S.S.G. § 2F1.1(b)(1)(G).[1] Wright contends that the loss could not exceed $59,700, however, as that is the amount she was able to withdraw from the account before being apprehended. Because the district court's calculation of the amount of loss attributable to a defendant's fraud is a finding of fact, we review it only for clear error. United States v. Morris, 80 F.3d 1151, 1171 (7th Cir.1996). The meaning of "loss" in section 2F1.1, however, presents a question of law that we take up de novo. Id.
 
 
 9
 Under the commentary to section 2F1.1, a court must look to the "intended loss that the defendant was attempting to inflict" if that amount is greater than the actual loss. U.S.S.G. § 2F1.1, comment. (n. 7). The district court found in this case that although the bank at most lost $59,700 from Wright's fraud, it was clear that she intended to inflict a $115,000 loss because she intended eventually to withdraw the entire amount of the fraudulent check. Wright failed to do so only because she was arrested while attempting to make her fourth withdrawal in less than a week. The district court's findings were eminently reasonable in light of Wright's conduct. The district court therefore did not clearly err by including the entire $115,000 as loss under section 2F1.1. See United States v. Strozier, 981 F.2d 281, 284-85 (7th Cir.1992) (defendant held responsible for entire amount fraudulently deposited although he succeeded in withdrawing only a portion of that amount).
 
 III.
 
 10
 The district court also added two points pursuant to section 2F1.1(b)(2)(A) after concluding that Wright's offense involved more than minimal planning. In accordance with the Guidelines' definition of that phrase (see U.S.S.G. § 1B1.1, comment. (n. 1(f))), the court noted that Wright's crime involved both more planning than that required for simple bank fraud and repeated acts over a period of days that were not purely opportune:
 
 
 11
 Ms. Wright telephoned a branch manager six days before her deposit. In addition to giving him a false story about the check, she ascertained the days he would be working. Ms. Wright then appeared at that manager's branch on a day the manager was working, and cajoled him to authorize a withdrawal of $2,500. The following day, she went to another branch to make her next withdrawal, simultaneously testing the advertised ten-day "hold." After the Christmas weekend, she presented herself still again at the other branch, this time withdrawing ten times as much as she had withdrawn the previous working day. Her next day's attempted withdrawal returned to the lower sum.
 
 
 12
 (R. 67 at 4.) We review the finding that an offense involved "more than minimal planning" for clear error. United States v. Panadero, 7 F.3d 691, 694-95 (7th Cir.1993).
 
 
 13
 Wright believes the district court erred by suggesting that her crime involved more planning than that required for simple bank fraud because, in her view, the instant crime was comprised only of a single deposit and three withdrawals. But as the district court explained, Wright's initial call to the home of a branch manager who happened to be a family friend, her meeting with that manager over a week later at the bank, and subsequent withdrawals from her new account at another bank location all indicate that Wright formed the intent to commit this crime in advance and then planned how best to accomplish it. See, e.g., United States v. Harrison, 42 F.3d 427, 432-33 (7th Cir.1994) (affirming enhancement for more than minimal planning where defendant gathered necessary information before executing his crime). It appears that Wright ultimately decided to use her relationship with the branch manager to initially deflect any questions about the check, to get her account established, and then to obtain a portion of the money immediately. She then moved to a different Society branch and attempted to withdraw as much money as possible as quickly as possible. This was not a crime, then, committed on the spur of the moment, but one that involved a good deal of advance planning. See United States v. Levinson, 56 F.3d 780, 782 (7th Cir.1995). The district court did not clearly err in concluding that Wright's fraud involved more than minimal planning.
 
 IV.
 
 14
 After concluding that Wright had seven criminal history points, which placed her in criminal history category IV, the district court determined to depart upward by three criminal history points, which moved Wright into criminal history category V. The court based this departure on its finding that category IV did not adequately reflect the likelihood that Wright would commit other crimes. See U.S.S.G. § 4A1.3 ("If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range."). The district court offered two reasons for that finding. First, the court pointed to the similarity between the instant bank fraud offense and the three previous convictions (for check deception, criminal conversion, and forgery) for which Wright had been assessed criminal history points. Second, the court observed that Wright had a number of additional convictions for similar conduct that received no criminal history points under the Guidelines either because the convictions were too old or the sentences for those convictions were too short. The court noted, in fact, that with the apparent exception of one six year period, Wright's criminal record indicates that she has regularly engaged in the same sort of criminal conduct (thefts, forgeries, and check deceptions) for the past twenty-two years. The district court found that Wright's criminal history category of IV did not adequately reflect "this remarkable record of recidivism ... [or] the likelihood that [she] will commit further crimes of theft, forgery, and check deception." (R. 67 at 9.)
 
 
 15
 Wright has offered little in the way of argument against the departure, as she has contested neither the degree of the district court's departure nor the facts relied upon to support it. She argues only that the district court's recidivism finding leads to a form of double counting because that finding relies in part on earlier confictions already assessed criminal history points under the Guidelines. There clearly was no double counting here. The district court was entitled to conclude under section 4A1.3 of the Guidelines that the criminal history points assessed to Wright for only three of her many similar offenses did not adequately reflect the likelihood that she will commit future crimes of the same kind. The court's finding as to Wright's recidivism is amply supported by the record and provides a proper basis for departure. See, e.g., United States v. Panadero, 7 F.3d 691, 697 (7th Cir.1993); United States v. Schmude, 901 F.2d 555, 559 (7th Cir.1990).
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 We refer to the November 1, 1994 version of the Sentencing Guidelines, as those Guidelines were in effect on the date of Wright's sentencing