17-4121-cr
*United States v. Moran*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2018

(Submitted: January 28, 2019          Decided: October 22, 2019)

Docket No. 17-4121-cr

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

DENNIS PRISTELL, AKA D, AKA DP,

DAVID YOUNG, AKA KAREEM, AKA REEM,

WILLIAM PARKER, AKA SHAH, MICHAEL SINGLETARY,

*Defendants,*

LAMONT MORAN, AKA L, AKA L-SPARKS, AKA GUDDA,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:

CALABRESI, CABRANES, AND CHIN, *Circuit Judges*.

---

Appeal from a judgment of the United States District Court for the Eastern District of New York (Glasser, *J.*) convicting defendant-appellant, upon his guilty plea, of conspiring to distribute and possess with intent to distribute heroin, and sentencing him principally to 84 months' imprisonment. Defendant-appellant contends that the district court erred by applying two sentencing enhancements under the United States Sentencing Guidelines: (1) three levels for role in the offense and (2) two levels for committing an offense as part of criminal conduct engaged in as a livelihood.

AFFIRMED.

Judge CALABRESI concurs in a separate opinion.

---

> MATTHEW JACOBS, Assistant United States Attorney (Susan Corkery, Assistant United States Attorney, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee.*
>
> JOYCE C. LONDON, Joyce C. London, P.C., New York, New York; Megan Wolfe Benett, Kreindler &

Kreindler LLP, New York, New York, *for Defendant-Appellant*.

CHIN, *Circuit Judge*:

Defendant-appellant Lamont Moran appeals from a judgment entered December 21, 2017, following his guilty plea, convicting him of conspiring to distribute and possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. He was sentenced principally to 84 months' imprisonment. On appeal, Moran challenges his sentence solely on procedural grounds, arguing that the district court erroneously applied a three-level enhancement for his role as a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B.1.1(b), and a two-level enhancement for the commission of an offense as part of a pattern of criminal conduct engaged in as a livelihood, pursuant to U.S.S.G. § 2D1.1(b)(16)(E).[1] For the reasons set forth below, the judgment of the district court is affirmed.

---

[1] In the Guidelines edition effective at the time of Moran's sentencing, the criminal livelihood enhancement appeared in U.S.S.G. § 2D1.1(b)(15)(E) (2016). In 2018, § 2D1.1 was amended, and the relevant enhancement now appears in § 2D1.1(b)(16)(E) (2018).

## BACKGROUND

**A.** *The Facts*

The facts, as set forth in the presentence report (the "PSR") and adopted by the district court, may be summarized as follows:

In early 2016, the Federal Bureau of Investigation (the "FBI") and the New York City Police Department began an investigation into gang-related crimes and heroin trafficking in Jamaica, Queens, principally focused on members of the gang "Get it in Stacks" ("GI$").

During the course of the investigation, the FBI intercepted communications relating to heroin trafficking from two cellphones associated with Moran. Between March 2016 and August 2016, law enforcement conducted controlled purchases of heroin from Moran on over a dozen occasions, and on at least one occasion Moran also sold the Confidential Source ("CS") fentanyl. The purchased packets were often labeled with Moran's brand names. The NYPD obtained additional evidence of Moran's criminal conduct in February 2016 from a cellphone seized during the arrest of GI$ member Joclyn Bridges, which revealed conversations between Moran and Bridges related to heroin trafficking.

Finally, photographs found on Moran's phones showed him holding a handgun and large amounts of cash.

The court-authorized intercepts revealed that a number of persons participated in Moran's drug-trafficking operation. Moran supervised co-defendants Dennis Pristell and David Young, who sold heroin in Queens, and William Parker, who obtained heroin from Moran several times a week to sell on Long Island. Parker in turn supplied co-defendant Michael Singletary, and worked with him to sell their supply. Moran also directed unindicted co-conspirator Bridges to monitor Young's drug sales. Between March 2016 and September 2016, Moran, Pristell, Young and Parker sold heroin almost every day.

Intercepted conversations between Moran and Pristell and Moran and Young demonstrated that Moran provided them heroin to sell and monitored their sales activity. For example, Moran discussed heroin trafficking with Young in an intercepted conversation on July 13, 2016:

> YOUNG: Yo, L . . . I got somebody that's willing to do the foot running, and I got my own spot right now. . . . I want to get back on board. I don't ever want to stop making money. I felt that what we had was damn good.
>
> . . .

MORAN: . . . All you got to do is when your customers call you, you call me and I will send my people to them to see them and I will give you something for doing that.

App'x at 62.

There is evidence that Moran and Young were in regular contact, as pen registers revealed hundreds of communications over less than two months between Moran and a telephone number a confidential informant used to contact Young.

Moran also regularly discussed heroin trafficking with Pristell, communicating with him more than 100 times during a two-month period. For example, on June 27, 2016, Pristell informed Moran that he had flushed some quantity of heroin down the toilet to avoid arrest, and Moran responded "Oh, ok, you got to eat that shit." App'x at 55. Less than a month later, Moran chastised Pristell for turning off his cellphone, thereby missing a number of calls:

PRISTELL: My phone was off. . . .

MORAN: Why in the hell would you do that? The money supposed to wake you up.

. . .

PRISTELL: I know what happened. I didn't charge my damn phone.

> MORAN: Come on D what kind of business are you running man?

App'x at 58-59.

On September 8, 2016, Moran was arrested on his way to meet a CS for a controlled delivery. During a search incident to Moran's arrest, FBI agents seized packets of heroin on Moran's person and in his car, as well as a cellphone, which revealed photos of him with GI$ gang members and counting money. Moran told the officers transporting him to the courthouse that he sold heroin to feed his family, saying "I don't view [heroin] as drugs, I view it as money." App'x at 175. Though he admitted to selling heroin, he noted that he was small time and not a kingpin.

**B.**    *Proceedings Below*

On April 24, 2017, Moran pleaded guilty to Count One of a three-count superseding indictment, which charged conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(B)(i), and 846. The PSR indicated that Moran was accountable for at least 700 grams of heroin and 4.37 grams of fentanyl, which resulted in a base offense level of 28. The PSR named Pristell, Young, Parker, and Singletary as participants in Moran's criminal activity. The PSR

recommended several offense level enhancements, including a two-level increase because the offense was "part of a pattern of criminal conduct engaged in as a livelihood," a two-level increase for possession of a firearm, and a three-level increase for Moran's role as a manager or supervisor. After a three-level reduction for acceptance of responsibility, Moran's total offense level was 32. Together with a criminal history category of I, the resulting Guidelines range was 121 to 151 months' imprisonment. The PSR further noted that Moran was employed as a part-time counselor, mentor, and activity specialist at Jacob Riis Settlement House between November 2011 and April 2016, and had started a new part-time position as a counselor at St. John's Residence for Boys the day before his September 2016 arrest.

Prior to the sentencing hearing, Moran objected to the PSR, challenging the managerial/supervisory role and criminal livelihood enhancements. As to the aggravating role adjustment, Moran argued that the individuals described as participants were merely customers who purchased small quantities partly for their own use and partly to sell to fund their next purchase. As to the criminal livelihood enhancement, Moran argued that his conduct did not meet the requirements for the enhancement and that his drug

activities could not be considered his livelihood. [2] The probation office affirmed the appropriateness of the managerial/supervisory role adjustment, but agreed with Moran that the criminal livelihood adjustment was inapplicable. As a result, the probation department issued an addendum to the PSR revising Moran's total offense level to 30, and recommending a Guidelines range of 97 to 121 months' imprisonment.

At sentencing, Moran renewed his objections to the two enhancements. The district court, however, overruled Moran's objections and adopted the Guidelines calculation set forth in the original PSR, which set forth a range of 121-151 months, but not the recommendations in the addendum. Finding that whether the original or revised Guidelines range applied would "not [] make a great deal of difference" in the final analysis, because it was "not going to sentence [Moran] to 121 months or 97 months," the district court sentenced Moran to 84 months' imprisonment, to be followed by four years of supervised release. App'x at 176, 197. This appeal followed.

---

[2] For a defendant to have engaged in criminal activity as a livelihood, he or she must have "derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law." U.S.S.G. § 4B1.3 cmt. n.2. The minimum wage during the relevant time period was $7.25, *see* 29 U.S.C. § 206, and so the income derived would have to exceed $14,500 for the prior twelve months.

## *STANDARD OF REVIEW*

In reviewing a sentence for procedural reasonableness, we apply a deferential abuse-of-discretion standard. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). We review a district court's interpretation and application of the Guidelines *de novo, see United States v. Adler*, 52 F.3d 20, 21 (2d Cir. 1995) (per curiam), and its factual findings for clear error, *see United States v. Mulder*, 273 F.3d 91, 116 (2d Cir. 2001). Procedural error occurs when, for example, the district court fails to calculate the Guidelines range or is mistaken in its calculation of the range. *See United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009).[3]

"The Government bears the burden of proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence." *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016). "If we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may

---

[3] In searching for error, we keep in mind the Supreme Court's instruction that the Guidelines merely "guide district courts in exercising their [sentencing] discretion . . . , but they do not constrain that discretion." *Beckles v. United States*, ---- U.S. -----, 137 S. Ct. 886, 894 (2017) (internal quotation marks and alterations omitted).

be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014) (per curiam) (internal quotation marks omitted).

## DISCUSSION

Moran appeals the sentence on procedural grounds, arguing that the court erred in calculating the applicable range under the Guidelines by wrongly applying two sentencing enhancements: a three-level increase for his role in the conspiracy as a manager or supervisor under U.S.S.G. § 3B1.1(b), and a two-level enhancement because the offense was part of a pattern of criminal conduct engaged in as a livelihood under U.S.S.G. § 2D1.1(b)(16)(E). We discuss the two procedural challenges in turn.

## I.    *Aggravating Role Enhancement*

Moran argues that the evidence failed to support the district court's findings that he exercised the requisite control and authority over others to qualify as a manager or supervisor, and that the criminal activity involved five or more participants or was otherwise extensive. Both findings are necessary to apply the aggravating role enhancement, and we discuss each in turn.

**A.** *Applicable Law*

Pursuant to U.S.S.G. § 3B1.1(b), a three-level enhancement is appropriate when "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Once its factual predicates have been established, the managerial role enhancement under § 3B1.1 is "mandatory." *United States v. Jiminez*, 68 F.3d 49, 51-52 (2d Cir. 1995). To qualify for the enhancement, a defendant need only manage or supervise one other participant, and may properly be considered a manager or supervisor "if he exercised some degree of control over others involved in the commission of the offense." *United States v. Birkin*, 366 F.3d 95, 101 (2d Cir. 2004) (alterations and internal quotation marks omitted). When determining if an enhancement is applicable, the district court uses the preponderance of the evidence standard. *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) (per curiam). The district court must make specific factual findings when enhancing a defendant's sentence based on his role in the offense, as such findings are necessary for appellate review. *See United States v. Stevens*, 985 F.2d 1175, 1184 (2d Cir. 1993).

In addition to the role requirement, the criminal activity must involve five or more participants or be otherwise extensive. A "participant" is defined as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n. 1. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered," including the defendant himself. *Id.* at cmt. 1 n. 3. Thus, a crime that "involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. n. 3. While a district court's findings should be sufficient to permit meaningful appellate review, courts "should be given latitude concerning their supervisory role findings, even when their findings were not as precise as they might have been." *United States v. Napoli*, 179 F.3d 1, 14 (2d Cir. 1999) (internal quotation marks omitted).

**B.**    *Application*

The district court found that the role enhancement applied because Moran played a supervisory or managerial role and there were at least five participants in the criminal activity.

### 1. *Supervisory or Managerial Role*

The content of the intercepted conversations between Moran and his co-defendants, as well as the sheer volume of communications between them, support a finding that Moran managed or supervised at least one of his co-defendants. For example, in one conversation when Pristell told Moran that he had to discard heroin in the toilet, Moran told him that he would be responsible for the discarded drugs. In another conversation, Moran chastised Pristell for oversleeping and turning his phone off. In yet another phone call, Moran complained that Pristell was hurting business by going on vacation without telling him. Similarly, wiretap evidence shows that Moran also had a supervisory or managerial role over Young who, upon his release from prison, told Moran that he wanted to "get back on track . . . back onboard. I don't ever want to stop making money. I felt that what we had was damn good." App'x at 104.

Moran argues that the intercepted conversations show him to be a supplier who sold small amounts of heroin to his co-defendants for their personal use. But the district court did not clearly err in holding that the

intercepted conversations and text messages showed that Moran was a manager or supervisor and not a mere vendor.

Finally, Moran cites to a list of "relevant factors" to consider when applying the enhancement. The factors are inapposite, however, as they are intended to distinguish leaders and organizers of criminal enterprises from managers and supervisors while the enhancement sought here relates to a manager rather than a leader. *See* U.S.S.G. § 3B1.1 cmt. n. 4. Accordingly, we conclude that the sentencing court did not clearly err in holding that Moran was a supervisor or manager.

### 2. *Five or more participants in the criminal activity*

The role enhancement also requires that there be five or more participants in the criminal activity or that the activity be otherwise extensive. *See* U.S.S.G. § 3B1.1(b). The PSR identified five participants -- Moran, Pristell, Young, Parker, and Singletary -- each of whom pleaded guilty to either conspiracy to distribute heroin or heroin distribution.

A sentencing court may fulfill its obligation to make findings by adopting the PSR, provided the PSR states enough facts to permit meaningful appellate review. *See United States v. Ware*, 577 F.3d 442, 452 (2d Cir. 2009). Here,

the sentencing court adopted the PSR, and the PSR (1) described Singletary's role in Moran's drug-trafficking organization as neither "minimal [nor] minor"; (2) discussed numerous intercepted communications between Moran and Pristell and Moran and Young concerning narcotics trafficking; and (3) reported that Parker admitted his participation in the instant offense in statements subsequent to his arrest. Indeed, the sentencing court explicitly identified Pristell, Young, Parker, and Singletary as participants in the drug trafficking operation, working with Moran. [4] Accordingly, we affirm the application of the aggravating role enhancement.

## II. *Criminal Livelihood Enhancement*

Moran argues that the criminal livelihood enhancement was erroneously applied because he did not qualify for an aggravating role enhancement, which is a precondition for the criminal livelihood enhancement, U.S.S.G. § 2D1.1(b)(16), and, even if he did qualify for the role enhancement, his conduct did not meet the requirements of the criminal livelihood enhancement.

---

[4] The government contended that Joclyn Bridges was an additional participant as an unindicted co-conspirator. Moran contends that because the PSR was silent as to Bridges, he cannot be considered a participant. We need not decide the question as there were five participants even without Bridges.

**A.** *Applicable Law*

Pursuant to U.S.S.G. § 2D1.1(b)(16)(E), a two-level enhancement is appropriate when a defendant receives an adjustment for an aggravating role under § 3B1.1 and the defendant committed the offense "as part of a pattern of criminal conduct engaged in as a livelihood." The section commentary at § 2D.1 cmt. n. 20(C) adopts the definitions of "pattern of criminal conduct" and "engaged in as a livelihood" found in Section 4B1.3:

> "Pattern of criminal conduct" means planned criminal acts occurring over a substantial period of time. Such acts may involve a single course of conduct or independent offenses.
>
> "Engaged in as livelihood" means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct).

U.S.S.G. § 4B1.3 cmt. ns. 1 & 2.

While this Court has not discussed the purpose of the criminal livelihood enhancement, other circuits have written that the "object [of the

- 17 -

enhancement] is to distinguish the professional from the amateur criminal and punish the former more heavily." *United States v. Taylor*, 45 F.3d 1104, 1106 (7th Cir. 1995). "[T]here is no doubt that the guideline's raison d'être was to deter professional criminals . . . ." *United States v. Gordon*, 852 F.3d 126, 139 (1st Cir. 2017). Distinguishing the professional criminal from the mere dabbler in crime, the heightened punishment of the criminal livelihood enhancement effectively targets the former.

**B.**     *Application*

Once a defendant qualifies for an aggravating role enhancement, the Sentencing Guidelines provide a two-pronged test for distinguishing career from amateur criminals: the defendant must (1) commit the offense as part of a pattern of criminal conduct occurring over a substantial period of time, and (2) engage in the conduct as a livelihood. The second prong has two elements: an income threshold and a requirement that the criminal conduct be the defendant's primary occupation. *See* U.S.S.G. § 4B1.3.

**1.**     *Substantial Period of Time*

The first prong of § 4B1.3 asks if the defendant committed the offense as a pattern of criminal conduct that occurred over "a substantial period

of time." *See* U.S.S.G. § 4B1.3 cmt. n. 1. The Guidelines do not define the phrase "substantial period of time," nor has this Court defined it in the context of this enhancement. Moran argues that the reference to a twelve-month period in the commentary defining "engaged as a livelihood" cabins the contextual meaning of the phrase "substantial period of time" to a period of no less than twelve months. Accordingly, he contends that the district court erred in applying the criminal livelihood enhancement because he was engaged in criminal conduct for no more than nine months. We review *de novo* the district court's interpretation of the Guidelines.

We find Moran's arguments unpersuasive both as a matter of textual interpretation and in light of the holdings of other circuits. First, in the context here, six months is consistent with the plain meaning of the phrase "substantial period of time." Moreover, though the phrase "twelve-month period" appears twice in the commentary to § 4B1.3, it does so only in the context of the second prong of the enhancement. Simply because twelve months is identified as the operative time period for the second prong does not compel us to apply it to the first. Indeed, had the sentencing commission intended to define "substantial period of time" as no less than twelve months, it could have chosen to do so, but

did not. *See See United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018) (noting

that "the presumption of consistent usage and meaningful variation, and the

textual [canon] of *expressio unius est exclusio alterius*[,] suggest that the presence of

a phrase applicable to one factor makes clear that the phrase's omission

elsewhere was deliberate" (alterations and internal quotation marks omitted)

(citing *Novella v. Westchester Cty.*, 661 F.3d 128, 142 (2d Cir. 2011)).

Second, the circuits that have considered what constitutes "a

substantial period of time" for purposes of § 4B1.3 have found that periods as

short as five months are sufficient. *See United States v. Irvin*, 906 F.2d 1424, 1426

(10th Cir. 1990) ("We interpret the phrase 'a substantial period of time' . . . to

require more than a short, quick, one-time offense. In this case [the conduct

occurred for] almost five months."); *cf. United States v. Hearrin*, 892 F.2d 756, 758

(8th Cir. 1990) ("extensive" criminal conduct over eight months); *United States v.

Reed*, 951 F.2d 97, 101 (6th Cir. 1991) (seven months); *United States v. Cryer*, 925

F.2d 828, 830 (5th Cir. 1991) (less than one year). Moreover, when considering

whether a given span of time constitutes a "substantial period," courts have taken

note when the criminal conduct was "a well-organized criminal venture." *See

Irvin*, 906 F.2d at 1426.

Here, Moran was charged with conduct that occurred between March 2016 and September 2016, a six-month period. The government contends that Moran's criminal conduct dated back to at least December 2015, citing text conversations between Moran and unindicted co-conspirator Joclyn Bridges concerning drug-trafficking. Indeed, at sentencing, Moran's counsel referred to "this nine-month period of selling heroin." App'x at 185. Even setting aside the alleged criminal conduct with Bridges, the six months in which Moran regularly engaged in heroin trafficking demonstrates that his criminal activity was not a "short, quick, one-time offense," but rather a sustained enterprise. The intercepted communications between Moran and his co-defendants moreover reveal a well-organized drug-trafficking venture in which Moran directly oversaw a number of participants. *See, e.g.*, App'x at 58-59, 62. Accordingly, we conclude that the sentencing court's finding that six months constituted a substantial period of time is consistent with the plain meaning of the words "a substantial period of time." It is also consistent with the purpose of § 4B1.3, namely to distinguish amateur from professional criminals, and the interpretation of § 4B1.3 by other circuits.

### 2. *Criminal Livelihood*

The second prong of § 4B1.3 considers whether the defendant engaged in the criminal conduct as a livelihood and has two elements: an income threshold and a requirement that the criminal conduct be the defendant's primary occupation.

### a. *Income Threshold*

For the income threshold to be met, the court must find that Moran derived income in excess of $14,500 in any twelve-month period. Moran argues that the government did not establish that he made at least $14,500 from the criminal conduct over a twelve-month period. We review for clear error the district court's determination of the extent of Moran's income from criminal conduct.[5]

We note, as a threshold matter, that the district court did not explicitly find that Moran earned at least $14,500 from his criminal conduct. But the district court made that finding implicitly. In the district court, the government argued that Moran met the income threshold and Moran twice declined to challenge the amount, though he challenged the application of the

---

[5] The government argues that the appropriate standard is plain error review, but we need not decide the question as we find no clear error, much less plain error.

enhancement on other grounds. The district court overruled Moran's objection and applied the enhancement.

A district court is entitled to infer a defendant's financial gain from the direct and circumstantial evidence in the record. *See, e.g.*, *United States v. Burgess*, 180 F.3d 37, 42 (2d Cir. 1999) (district court is entitled to infer that defendant met income threshold when he disclosed that he had a monthly income of $3,000 and monthly expenses of $2,000, had large sums of money stashed in foreign banks, and no legitimate employment during relevant twelve-month period); *Taylor*, 45 F.3d at 1106-07 (district court entitled to infer the defendant met the income threshold because the defendant's drug habit required more than the minimum annual income to maintain and he had no legitimate income during the relevant period).

Here, as the government notes, there was ample evidence in the record to show that Moran had earned more than $14,500 in income from criminal conduct in the prior twelve months. The PSR found that Moran sold between 700 and 1,000 grams over six months, with each gram selling for as little

as $14 per gram and as much as $17.50 per gram.[6]  Moreover, the range of 700-

1,000 grams applied to his sales over six months, and, as he conceded below,

Moran sold heroin for at least nine months.  A single customer, the CS,

accounted for nearly $10,000 in sales.  Numerous intercepted conversations

between Moran and multiple co-defendants in which, for example, Moran

chastises a co-defendant for being unavailable to customers and hurting

business, support an inference that there were many other transactions and

customers.  Finally, Moran did not argue below that he did not meet the income

threshold, and even on appeal does not deny that he earned the requisite $14,500,

but instead merely faults the PSR and the district court for failing to make

explicit findings.  Thus, we conclude that the district court did not clearly err in

finding that Moran met the threshold.

Moran principally argues that the government must show that he

made $14,500 in net, as opposed to gross, income over the relevant period.

Although this Court has not addressed this question, among the circuits that

have, the "majority approach" is to use gross income.  *United States v. Gordon*, 852

---

[6]      In intercepted conversations, Moran negotiated the sale of a bundle of heroin for $70, with a
bundle containing between four and five grams of heroin.  Moran sold between 700 and 1,000 grams,
which is income of between $9,800 and $17,500.

- 24 -

F.3d 126, 132 (1st Cir. 2017); *see, e.g., United States v. Berry*, 930 F.3d 997, 999 (8th

Cir. 2019); *Reed*, 951 F.2d at 101-02; *Cryer*, 925 F.2d at 830.  We agree that using

gross income is appropriate because the "guideline's income threshold is

designed to approximate the annual income of an employee earning the federal

minimum wage, which is a gross figure." *Gordon*, 852 F.3d at 131.  Further, the

Guidelines are silent as to how to calculate net income or to allocate the burden

of proving a defendant's net income, an additional indication that gross income

is to be used.  *Id.*

Finally, the cases Moran cites in support of using net income rely on

a materially different, earlier version of the Guidelines that looked only at

whether a defendant derived a substantial portion of his income from criminal

activity, rather than the Guidelines' current two-pronged analysis.  *See, e.g., Lee v.

United States*, 939 F.2d 503, 504 (7th Cir. 1991).  *Lee* is inapposite, however, as

under the current Guidelines a court must first determine whether the defendant

derived income in excess of a particular amount, and then whether criminal

conduct was the defendant's primary occupation.  *See* § 4B1.3 cmt. n. 2.  Because

the current Guidelines provide a formula for calculating the income threshold,

"the relative predominance of a defendant's criminal and legitimate income . . . is

relevant, if at all, only to the prong-two question of whether criminal activity was the defendant's primary occupation." *Gordon*, 85 F.3d at 133. Accordingly, we find that the district court did not err when it used Moran's gross income in determining his eligibility for the criminal livelihood enhancement.

### b. *Primary Occupation*

The second element of the second prong asks whether the defendant engaged in the criminal conduct as his primary occupation. To satisfy this element, the court must find that "the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (e.g., the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct)." U.S.S.G. § 4B1.3 cmt. n. 2.

This Circuit has directly addressed this element only once, finding that the element was satisfied by the defendant's admission that he earned his living through his criminal conduct. *See Burgess*, 180 F.3d at 41. Other circuits have considered the proportion of income a defendant derived from criminal as opposed to legitimate sources to determine whether the defendant's primary occupation was criminal conduct. *See, e.g., Reed*, 951 F.2d at 101-02 (finding

primary occupation where criminal conduct in seven-month period yielded over $17,000 compared with $350 from legitimate sources); *United States v. Salazar*, 909 F.2d 1447, 1449 (10th Cir. 1990) (between $13,500 and $27,000 from criminal conduct and $2,100 to $2,400 from legitimate activity over seven to eight months); *United States v. Luster*, 889 F.2d 1523, 1531 (6th Cir. 1989) ($8,223.58 from criminal activity compared with $500 from legitimate sources over three months). Courts have also considered other factors, such as a defendant's inability to verify purported legitimate employment. *See United States v. Quertermous*, 946 F.2d 375, 378 (5th Cir. 1991).

Here, Moran was employed as a part-time youth counselor during some of the time that he was also engaged in criminal conduct. He left a part-time job at the Jacob Riis Settlement House in mid-April 2016 where he had been earning $14 an hour, and began a new job at St. John's Residence for Boys one day before his arrest on September 7, 2016. His former employers wrote supportive letters to the court on his behalf, confirming his employment. Moran thus was employed in a legitimate occupation for approximately half the time he was engaged in criminal conduct if his criminal conduct is dated to December 2015. While there is no evidence of how much Moran earned from his legitimate

employment in 2016, according to the PSR his adjusted gross income between 2012 and 2015, the years he was working at Jacob Riis Settlement House, ranged from $9,848 to $12,319. Given that Moran earned at least $14,500 from heroin trafficking over a twelve-month period, it is apparent that he derived more income from his criminal conduct than from his legitimate employment.

Moran reportedly left his job in April 2016 because his family was "pressed for cash" and, as he told law enforcement officers during transport to the courthouse, he sold heroin to feed his family. Though the sentencing court directly referenced only Moran's statements that he sold drugs to feed his family to support its finding that criminal conduct was his primary occupation, additional evidence in the record supports the finding. For example, Moran reported that he left his job in April 2016 because of his drug-trafficking work, saying "I resigned from the Jacob Riis because I was not giving that job my full attention. I became caught up with the devil's work." App'x at 93. Moran also conceded that he made daily deliveries of heroin; he communicated regularly with his co-conspirators regarding drug sales; and he chastised one co-defendant for hurting the business when he did not respond promptly to his calls. Accordingly, that Moran was legitimately employed during some portion of the

time that he was also engaged in drug-trafficking does not undermine the determination that his criminal conduct was his primary occupation. Considering the totality of the circumstances, we conclude that the sentencing court did not clearly err when it found that Moran's criminal conduct was his primary occupation.

Finally, even if the application of the enhancement was inappropriate, the district court noted on the record that whether the original or revised Guidelines range applied would "not [] make a great deal of difference" in the final analysis because it was "not going to sentence [Moran] to 121 months or 97 months." App'x at 176, 197; *see also Mandell*, 752 F.3d at 553 ("If we identify procedural error in a sentence, but the record indicates clearly that the district would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing.") (internal quotation marks omitted). Indeed, the 84-month

sentence imposed by the district court was a below-Guidelines sentence even with the lower range of 97-121 months.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.

GUIDO CALABRESI, *Circuit Judge*, concurring:

I agree with the majority that the Defendant's sentence should be affirmed, and I join Part I of the Court's opinion in its entirety. I believe, however—consistent with the majority's statement, Maj. Op. 29—that the district court made clear that it would have given the same sentence regardless of whether the criminal livelihood enhancement applied. That, under our holding in *United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014), makes the discussion of the criminal livelihood enhancement unnecessary to the Court's result. For this reason, I prefer not to join Part II of the Court's opinion, and respectfully concur in the result as to that Part.